**PUERTO RICO AQUEDUCT AND SEWER AUTHORITY,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Respondent.

No. 93–2340.

United States Court of Appeals,
First Circuit.

Argued June 9, 1994.

Decided Aug. 31, 1994.

Neil T. Proto, with whom John B. Britton, Lisa K. Hsiao, Verner, Liipfert, Bernhard,

McPherson & Hand, Chartered, Washington, DC, Edgar Rodriguez–Mendez, San Juan, PR, and Jorge Marrero–Narvaez, Washington, DC, were on brief, for petitioner.

Michael J. Zevenbergen, Atty., U.S. Dept. of Justice Environmental Defense Section, with whom Lois J. Schiffer, Acting Asst. Atty. Gen., Stephen J. Sweeney, Office of General Counsel, EPA, and Janice Whitney, Office of Regional Counsel, EPA Region II, Washington, DC, were on brief, for respondent.

Before SELYA and CYR, Circuit Judges, and PETTINE,* Senior District Judge.

SELYA, Circuit Judge.

The United States Environmental Protection Agency (EPA), respondent before us, refused to hold an evidentiary hearing regarding its determination that a facility in Mayaguez owned by petitioner, Puerto Rico Aqueduct and Sewer Authority (PRASA), must fully meet the Clean Water Act's secondary treatment requirements for publicly owned treatment works (POTWs). The gist of EPA's decision was straightforward: having previously established secondary treatment requirements because PRASA's POTW emitted pollutants into stressed waters, it determined that PRASA had failed to proffer any legally cognizable basis for modifying the requirements.

Petitioner now seeks judicial review of this determination. Its flagship objection demands that we place in bold relief the concept of administrative summary judgment. Petitioner's less touted objections implicate the agency's "stressed waters" standards.[1] Descrying no flaw in EPA's application of either its procedural or substantive regulations, we affirm.

---

* Of the District of Rhode Island, sitting by designation.

1. "Stressed waters" are "those receiving environments in which an applicant can demonstrate to the satisfaction of the Administrator, that the absence of a balanced, indigenous population is caused solely by human perturbations other than the applicant's modified discharge." 40 C.F.R. § 125.58(t) (1993).

2. While EPA's initial decision may be read to rest in part on PRASA's failure to satisfy subsections

## I. STATUTORY AND REGULATORY FRAMEWORK

Under the Clean Water Act, no pollutant may be emitted into this nation's waters except in compliance with a National Pollution Discharge Elimination System (NPDES) permit. See 33 U.S.C. § 1311(a) (1988). Ordinarily, the NPDES permit issued to a POTW includes certain technology-based standards known as secondary treatment requirements. See id. § 1311(b)(1)(B). A POTW can obtain relief from these requirements by meeting nine separate criteria. These criteria are limned in 33 U.S.C. § 1311(h). They require the applicant to make various demonstrations regarding matters such as: the effects of the discharge on other sources and on marine life; standards and procedures for monitoring the discharge; and methods of ensuring control over the sources introducing waste into the POTW. Of this ennead, only the second criterion, embodied in section 1311(h)(2), is relevant to this appeal.[2]

To satisfy section 1311(h)(2), a POTW must show that

the discharge of pollutants in accordance with such modified requirements will not interfere, alone or in combination with pollutants from other sources, with the attainment or maintenance of that water quality which assures protection of public water supplies and the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife, and allows recreational activities, in and on the water....

33 U.S.C. § 1311(h)(2) (1988). The information necessary for a section 1311(h)(2) demonstration is described by the implementing

1311(h)(1) and (h)(9), as well as (h)(2), the Environmental Appeals Board did not reach those issues, see In re Mayaguez Regional Sewage Treatment Plant, NPDES Appeal No. 92–93 (August 23, 1993), slip op. at 9 n. 13. Since the initial decision constitutes final agency action only when the Board denies review or summarily affirms, see 40 C.F.R. § 124.91(f) (1993), not where, as here, the Board writes a full opinion, we decline EPA's invitation that we decide the case under either (h)(1) or (h)(9).

regulation, under which an applicant who cannot meet the requirements of 40 C.F.R. § 125.61(a)–(e) due to "human perturbations" other than its modified discharge must meet the stressed waters requirements of 40 C.F.R. § 125.61(f). Under these requirements, the applicant must demonstrate that its discharge will not:

(1) contribute to, increase, or perpetuate such stressed conditions;

(2) contribute to further degradation of the biota or water quality if the level of human perturbation from other sources increases; and

(3) retard the recovery of the biota or water quality if the level of human perturbation from other sources decreases.

40 C.F.R. § 125.61(f) (1993). For ease of comprehension, we sometimes will refer to the (f)(1) showing as the "current impacts" showing and the (f)(3) showing as the "future impacts" showing. Although the (f)(2) showing would seem to be intimately related to the (f)(3) showing, it was not discussed in the proceedings below and, therefore, is not a matter of current concern.

Unlike typical NPDES permit proceedings, EPA makes a tentative decision to grant or deny section 1311(h) modifications prior to proposing a permit. *See* 40 C.F.R. § 125.59(d) (1993). A POTW that has submitted a timely application for such modification may revise it once as of right. *See id.* § 125.59(d)(1). EPA also may authorize or request the submission of additional information. *See id.* § 125.59(f)(1).

After issuance of a tentative decision, followed by public notice and opportunity for written comment, EPA makes a final determination in regard to the proposed action. *See* 40 C.F.R. § 124.15 (1993). That decision becomes the final permit, effective in thirty days, unless it is administratively appealed. *See id.* § 124.15(b). If an appeal is taken, a party may request an evidentiary hearing to contest the resolution of any question raised in the earlier proceedings. *See id.* § 124.-74(a). The request must specifically identify the legal and factual issues and their relevance to the permit decision. *Id.* § 124.-75(a)(1). EPA's Regional Administrator then grants or denies the request. *Id.* § 124.-75(a)(1).

If a request for an evidentiary hearing is denied, the denial becomes final agency action within thirty days unless a protest is filed with the Environmental Appeals Board (the Board). *See id.* §§ 124.60(c)(5), 124.91. In turn, an order by the Board abjuring review renders final the Regional Administrator's previous decision. *See id.* § 124.-91(f)(1).

## II. PROCEDURAL BACKGROUND

This case aptly illustrates how the regulatory scheme works. PRASA initially sought a section 1311(h) modification for its Mayaguez sewage facility by application dated September 13, 1979. EPA, hampered by delays in obtaining input from local environmental officials, did not issue a tentative denial of the request until February 6, 1984. One year later, after PRASA presented a revised application, EPA issued another tentative denial. On December 13, 1991, following notice, comment, and a two-day public hearing, EPA dashed PRASA's hopes by issuing a final denial of its request for modification.

Hope, of course, often springs eternal, *see* Alexander Pope, *An Essay on Man,* Epistle 1 (1734), and PRASA's hopes of obtaining a modification were renewed in 1992 by a United States Geological Survey (USGS) report that contained some conclusions helpful to PRASA's cause. PRASA commenced its administrative appeal of EPA's final denial by submitting a request for an evidentiary hearing accompanied by the draft USGS study. On July 23, 1992, the USGS report notwithstanding, EPA Region II rejected PRASA's request for an evidentiary hearing. The Board affirmed. *See In re Mayaguez Regional Sewage Treatment Plant,* NPDES Appeal No. 92–93 (August 23, 1993) (Board Op.). PRASA immediately invoked 33 U.S.C. § 1369(b) and petitioned for judicial review.

In a passage that frames the central battleground in this venue, the Board self-consciously construed the procedural standard governing requests for evidentiary hearings, 40 C.F.R. § 124.75, to necessitate the pres-

ence of a "genuine issue of material fact" as a prerequisite to avoiding summary disposition of requests for review, Board Op. at 11. The Board characterized this requirement as "very similar to the requirement set forth in Rule 56 of the Federal Rules of Civil Procedure." *Id.; see also id.* at 13 (explaining that the Board's standard and the Rule 56 standard are "for our purposes virtually identical"). Warming to the task, the Board lauded case law dealing with Rule 56 as offering "useful guidance" in connection with section 124.75, *id.* at 11, and proclaimed that the Rule 56 standard "should be applied in the context of evidentiary hearing requests as well," *id.* at 13.

Scrutinizing the record through this prism, the Board held that PRASA did not merit a hearing because it had not presented a genuine issue of material fact as to either the current impacts showing required under 40 C.F.R. § 125.61(f)(1) or the future impacts showing required under 40 C.F.R. § 125.-61(f)(3). Put another way, the Board thought that no evidentiary hearing should be convened because PRASA had not adduced sufficient proof from which a reasonable decisionmaker could find, by a preponderance of the evidence,[3] either that the Mayaguez POTW was not currently contributing to the stressed condition of the surrounding waters, or that the facility would not in the future inhibit recovery of the surrounding stressed waters in the event that other stresses relented. *See id.* at 15–18. This ruling was tantamount to the entry of summary judgment, effectively terminating PRASA's administrative appeal.

## III. STANDARD OF REVIEW

■ We are mindful that we operate at the busy intersection of three deferential standards of review. In the first place, agency decisions made by informal adjudication may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988); *see also Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Sierra Club v. Marsh,* 976 F.2d 763, 769 (1st Cir.1992). In the second place, an agency deserves an extra measure of deference with regard to factual questions involving scientific matters in its area of expertise. *See, e.g., Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); *FPC v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972); *Town of Brookline v. Gorsuch,* 667 F.2d 215, 219–20 (1st Cir.1981). Mixed questions of law and fact, at least to the extent that they are fact-dominated, fall under this rubric. *See Gorsuch,* 667 F.2d at 220; *cf. In re Howard,* 996 F.2d 1320, 1327–28 (1st Cir. 1993) (recognizing that appeals in the federal court system are usually arrayed along a degree-of-deference continuum in which deference increases in proportion to the factual component of the determination). And, finally, the respect usually accorded an agency's interpretation of a statute it is charged to execute, *see Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), is magnified when the agency interprets its own regulations, *see, e.g., Arkansas v. Oklahoma,* —— U.S. ——, ——–——, 112 S.Ct. 1046, 1059–60, 117 L.Ed.2d 239 (1992); *Commonwealth of Mass., DPW v. Secretary of Agric.,* 984 F.2d 514, 524 (1st Cir.1993) (citing cases).

## IV. ADMINISTRATIVE SUMMARY JUDGMENT

In this court, PRASA hawks most vigorously a claim of procedural error. This claim spotlights the Board's interpretation of EPA's standard for dispensing (or dispensing with) evidentiary hearings, especially its conclusion that the text of the applicable regulation, 40 C.F.R. § 124.75(a)(1) (stipulating that, to warrant an evidentiary hearing and deflect administrative summary judgment, the non-moving party must establish the ex-

---

**3.** The Board routinely applies the preponderance standard in permit determinations. *See* Board Op. at 13 n. 18. This is of some consequence for present purposes because Rule 56 frequently implicates the substantive burdens of proof that

would apply if the particular case went forward uninterrupted. *See Villanueva v. Wellesley Coll.,* 930 F.2d 124, 129 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

istence of "material issues of fact relevant to the issuance of the permit"), should be read as the functional equivalent of Fed.R.Civ.P. 56(c) (which authorizes summary judgment if there is "no genuine issue as to any material fact," and thereby requires the non-moving party to establish the existence of a genuinely disputed material fact to forestall summary judgment). Section 124.75, PRASA asserts, contains no "genuineness" requirement, and, moreover, even if the Board had the authority to read a "genuineness" requirement into the regulation, it could not do so without giving advance notice. We find no merit in these assertions.

### The Structure of Administrative Summary Judgment

In erecting an adjudicatory framework that included an administrative summary judgment procedure, EPA necessarily contemplated that, to qualify for an evidentiary hearing, a party would have to present a genuine and material dispute. Those two requirements are inherent in the very concept of administrative summary judgment. Any other assumption borders on the chimerical: under federal case law, a "material" fact is one that may affect the outcome of the case, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); a "genuine" fact dispute is one that a reasonable decisionmaker could decide in favor of either party under the applicable standard of proof, or in other words, one that is worthy of being more fully adjudicated (trialworthy in the courts' parlance; hearing-worthy in the agencies' parlance).[4] *See Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *One Parcel*, 960 F.2d at 204. To force an agency fully to adjudicate a dispute that is patently frivolous, or that can be resolved in only one way, or that can have no bearing on the disposition of the case, would be mindless, and would suffocate the root purpose for making available a summary procedure. Indeed, to argue—as does petitioner—that a speculative

or purely theoretical dispute—in other words, a non-genuine dispute—can derail summary judgment is sheer persiflage.

We think that EPA's regulations lawfully can be read to incorporate this binary test, featuring genuineness and materiality. What is more, we refuse to attach talismanic significance to the absence of the stock phrase "genuine issue of material fact." The reference found in 40 C.F.R. § 124.75(a)(1) to "material" issues of "relevant" fact achieves precisely the same end. In practice, courts and agencies regularly use a variety of terms to describe the two pillars of summary judgment.

We hasten to add that, despite this linguistic equivalency, explicitly drawing a connection to Rule 56 accomplishes three things. First, it provides a common vocabulary, easily understandable by litigants, lawyers, and adjudicators. Second, it introduces into an agency's jurisprudence a ready-made ensemble of decisional precedents associated with Rule 56, *see, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (holding that at the summary judgment stage the evidence must be examined in the light most favorable to the nonmovant). Third, it carries with it certain expectations, conditioned by everyday experience in the federal courts, about the kind and degree of evidence deemed necessary to create a genuine dispute over a material fact. *See, e.g., Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (explaining that to withstand summary judgment, evidence must be "significantly probative"); *Garside*, 895 F.2d at 49–50 (discussing type and kind of opinion evidence that may forestall summary judgment).

Notwithstanding the obvious advantages of drawing a parallel between the courts' and the agencies' versions of summary judgment, petitioner contends that the Board went too far too fast. In support, PRASA posits three interrelated arguments: (1) that summary judgment, as it exists in the courts, has no legitimate place in agency practice; (2) that administrative summary judgment does not

---

**4.** While these definitions developed in the milieu of Rule 56, they are by no means limited to that milieu.

carry with it the baggage of Rule 56; and (3) that, in all events, EPA took an impermissible shortcut and embraced a Rule 56 standard precipitously, without affording fair notice or an opportunity to respond. These arguments lack force.

### The Validity of Administrative Summary Judgment

The choice between summary judgment and full adjudication—in virtually any context—reflects a balancing of the value of efficiency against the values of accuracy and fairness. Seen in that light, summary judgment often makes especially good sense in an administrative forum, for, given the volume of matters coursing through an agency's hallways, efficiency is perhaps more central to an agency than to a court. *See* Charles C. Ames & Steven C. McCracken, *Framing Regulatory Standards to Avoid Formal Adjudication: The FDA As a Case Study*, 64 Cal.L.Rev. 14, 34–35 (1976). At the same time, summary judgment is less jarring in the administrative context; after all, even under optimal conditions, agencies do not afford parties full-dress jury trials. Taking these factors into account, it is unsurprising that most major agencies in the federal system have opted to make available procedures for the summary disposition of adjudicatory matters. *See, e.g.,* 10 C.F.R. § 2.749 (1994) (NRC); 16 C.F.R. § 3.24 (1994) (FTC); 21 C.F.R. § 12.93 (1994) (FDA); 47 C.F.R. § 1.251 (1993) (FCC); 40 C.F.R. §§ 22.20, 124.75, 164.91 (1993) (EPA); 29 C.F.R. 102.-35(h) (1993) (NLRB); 29 C.F.R. § 2200.2 (1993) (OSHA).[5]

Administrative summary judgment is not only widely accepted, but also intrinsically valid. An agency's choice of such a procedural device is deserving of deference under "the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519,

544, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978). Applying this tenet, the Court has upheld an assortment of summary procedures, some closely resembling Rule 56, in the face of claims that the procedures are invalid because they deprive parties of their "right" to a hearing before the agency. *See Heckler v. Campbell*, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983); *National Indep. Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388, 398–99, 96 S.Ct. 809, 814–15, 46 L.Ed.2d 580 (1976); *FPC v. Texaco, Inc.*, 377 U.S. 33, 39–44, 84 S.Ct. 1105, 1109–12, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956); *see also* Ames & McCracken, *supra,* at 41 n. 164 (listing cases to similar effect involving different agencies). Most significantly for our purposes, the Court has given its seal of approval to a highly analogous summary procedure for denial of a hearing, *see Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973) (involving FDA's procedure for administrative summary judgment), and to an earlier version of the very procedure that we review today, *see Costle v. Pacific Legal Found.*, 445 U.S. 198, 214, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980).[6]

■ Petitioner's claim of invalidity consists mainly of rhetorical flourishes and cannot scale this mountain of case law. Due process simply does not require an agency to convene an evidentiary hearing when it appears conclusively from the papers that, on the available evidence, the case only can be decided one way. *See Hynson*, 412 U.S. at 621, 93 S.Ct. at 2479. It follows that administrative summary judgment, properly configured, is an acceptable procedural device.

### Applicability of Rule 56 Precedents

Petitioner's attempt to break the bond between administrative summary judgment and

---

5. An important exception is the SEC. *See* Rules of Practice, Exchange Act Release No. 33,163 [1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 85,257, at 84,742 (Nov. 5, 1993) (rejecting Rule 56 model on grounds that SEC practice does not permit discovery or prehearing affidavits).

6. *Costle* dealt with the direct ancestor of 40 C.F.R. § 125.75(a)(1), namely, 40 C.F.R. § 125.-36(c)(1)(ii) (1979). The Court held that the EPA lawfully could "limit any adjudicatory hearing to the situation where an interested party raises a material issue of fact." 445 U.S. at 214, 100 S.Ct. at 1105.

its courtroom counterpart is similarly unavailing. From its inception, the concept of administrative summary judgment has been linked inextricably to Fed.R.Civ.P. 56. In all probability, it was Professor Davis who first forged this link. He wrote: "Some agencies might well take a leaf from the federal rules of civil procedure and permit summary judgment without evidence when no issue of fact is presented." 1 Kenneth C. Davis, *Administrative Law Treatise* § 8.13, at 578 (1958). A dozen years later, two other leading administrative law scholars seized upon this sentence and developed it into a highly influential report to the Committee on Agency Organization and Procedure of the Administrative Conference of the United States. *See* Ernest Gellhorn & William F. Robinson, Jr., *Summary Judgment in Administrative Adjudication,* 84 Harv.L.Rev. 612 (1971) (rendering the report in article form).

Consistent with the circumstances of its birth, administrative summary judgment has maintained a close relationship with Rule 56. Many agencies habitually look to Rule 56 case law for guidance in respect to administrative summary judgments. *See, e.g., Phillips Pipe Line Co. v. Phillips Pipe Co.,* 1994 WL 145508, at *1, 1994 FERC LEXIS 757, at *3 (April 26, 1994) (applying 18 C.F.R. § 385.217); *United States v. Scotto Bros. Woodbury Restaurant, Inc.,* 1993 WL 595734, at *6, 1993 OCAHO LEXIS 95, at *14 (December 7, 1993) (outlining practice in Executive Office for Immigration Review). Other agencies, like EPA in the present context, have taken the step of formalizing the relationship. *See, e.g.,* 29 C.F.R. § 2200.2 (1993) (making Rule 56 directly applicable to proceedings before OSHA); *see also In re Summary Decision Procedures,* 34 F.C.C.2d 485, 487–88 (1972) (characterizing an FCC summary disposition regulation, 47 C.F.R. § 1.251(a)(1), as "essentially the same" as Rule 56).

■ In view of this history, one respected court has gone so far as to say, perhaps overbroadly, that the principles of summary judgment outlined in *Liberty Lobby* "apply with equal force in the context of administrative judgment." *John D. Copanos & Sons, Inc. v. FDA,* 854 F.2d 510, 523 (D.C.Cir. 1988). We take a more circumspect view. In our opinion, Rule 56 is the prototype for administrative summary judgment procedures, and the jurisprudence that has grown up around Rule 56 is, therefore, the most fertile source of information about administrative summary judgment. Thus, "[w]ith minor individual modifications, the summary judgment procedures should be similar in most agencies [to those under Rule 56]." 1 Charles H. Koch, Jr., *Administrative Law & Practice* § 5.78, at 419 (1985). Hence, we reject petitioner's contention that Rule 56 precedents are inapposite in proceedings before administrative agencies.

### *Departure from Precedent*

■ The linchpin of petitioner's final procedural argument is the notion that the Board broke new ground in patterning its inquiry after Rule 56. We disagree.

■ It is well established that agencies are free to announce and develop rules in an adjudicatory setting. *See, e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). Of course, there are limits on this freedom. As a general matter, when an adjudicating agency retroactively applies a new legal standard that significantly alters the rules of the game, the agency is obliged to give litigants proper notice and a meaningful opportunity to adjust.[7] *See, e.g., Aero Mayflower Transit Co. v. ICC,* 699 F.2d 938, 942 (7th Cir. 1983); *Hatch v. FERC,* 654 F.2d 825, 835 (D.C.Cir.1981). By the same token, an agency "cannot depart significantly from prior precedent 'without explicitly recognizing that it is doing so and explaining why.'" *Congreso de Uniones Industriales v. NLRB,* 966 F.2d 36, 39 (1st Cir.1992) (citation omitted); *accord Davila–Bardales v. INS,* 27 F.3d 1, 5 (1st Cir.1994).

---

**7.** While this requirement derives in part from a section of the Administrative Procedure Act that applies only to full-fledged hearings, *see* 5 U.S.C. § 554(b)(3) (1988), the requirement is grounded on general considerations of fairness. Accordingly, we see no reason why it should not also apply to adjudicative proceedings.

These principles do not assist petitioner's cause. Though petitioner asseverates that, in the proceedings below, EPA abruptly adopted a new legal standard that substantially changed the showing required of a party seeking an evidentiary hearing, this scenario is more imagined than real. Here, the record reflects neither a departure from precedent nor an alteration of the required showing. To the contrary, the Board's approach to section 124.75 proceeds naturally from its earlier construction of the provision and falls well within the mainstream of its previously established practice. We explain briefly.

Although the Board never before has made the equation between Rule 56 and EPA's summary judgment procedure so explicit, it traditionally has equated its procedural standard for denial of an evidentiary hearing anent an NPDES permit with the Rule 56 yardstick. On at least three prior occasions, the Board suggested that section 124.75's reference to the presentation of "material issues of fact relevant to the issuance of the permit" requires the nonmovant to set forth a "genuine issue of material fact." *See In re City of Jacksonville, Etc.*, NPDES Appeal No. 91–19 (Aug. 4, 1992), slip op. at 2; *In re Miami–Dade Water & Sewer Auth. Dep't*, NPDES Appeal No. 91–14 (July 27, 1992), slip op. at 17; *In re Great Lakes Chem. Corp.*, NPDES Appeal No. 84–8 (Sept. 3, 1985), slip op. at 4.[8]

Then, too, EPA has long espoused the view, in a wide variety of settings, that while the Civil Rules are not binding on agencies, they may inform administrative practice in appropriate situations. *See, e.g., In re Harmon Elecs., Inc.*, 1993 WL 326423, at *4, 1993 RCRA LEXIS 113 at *9–*10 (Aug. 17,

1993); *In re Premier Metal Prods.*, 1992 RCRA LEXIS 156, at *2 (Dec. 23, 1992). This is an approach rather consistently followed both by EPA, *see, e.g., In re Wego Chem. & Mineral Corp.*, 1993 WL 61174, at *8, 1993 TSCA LEXIS 91, at *25–*26 (Feb. 24, 1993), and by the federal courts, *see, e.g., Amberg v. FDIC*, 934 F.2d 681, 685 (5th Cir.1991) (suggesting that administrative decisionmakers should look for guidance to the Civil Rules when interpreting regulations containing concepts or language derived in part from those rules).

In sum, the procedure to which PRASA objects did not spring suddenly and unannounced from EPA's bureaucratic brow. Rather, by the time that the agency decided this case, the concept that only the presence of a genuine issue about a material fact could forestall *brevis* disposition had taken deep root in administrative soil. Thus, PRASA should have known all along that it would be expected to present a genuine and material dispute in order to earn an evidentiary hearing. Though the Board had never before invoked Rule 56 in *haec verba* as a guide to section 124.75, any reasonable litigant familiar with administrative practice in general and with EPA's precedents in particular should have anticipated that it would be required to present evidence adequate to overcome the functional equivalent of a Rule 56 motion.[9]

Little more need be said. The Board's use of Rule 56 here was consistent both with its prior practice and with prevalent understandings of administrative summary judgment. Thus, the Board's articulation, albeit "new" in a certain sense, falls well within the range of hitherto unspoken principles that

---

8. *Great Lakes* is of special interest, for in that case the EPA made manifest that it considered the term "material" as used in section 124.75 to be akin to the federal courts' definition of "genuine" under Rule 56. After making a casual reference to Rule 56's language, the Board concluded, using the terms contained in section 124.75, that the petitioner's evidence was "relevant" but not "material." It was not "material," the Board explained, because "evidentiary hearings [should not] be granted whenever a party makes a bare assertion, without anything more, that a permit's monitoring requirements should be reduced or modified—this would hopelessly crowd hearing

dockets and clearly is not in accord with the purposes of ... the Agency's regulations." *Great Lakes*, at 14.

9. In any event, to the extent (if at all) that PRASA failed to realize that Rule 56 would inform the Board's decision about whether to hold a hearing, we fail to see how it was prejudiced. For aught that appears, PRASA's evidentiary presentation would not have differed; to this date it has been unable to deterrate any proof sufficient to create a genuine issue about either current or future impacts.

appropriately may be announced in the course of rendering an adjudicative determination. *See Bell Aerospace,* 416 U.S. at 294, 94 S.Ct. at 1771; *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *Molina v. INS,* 981 F.2d 14, 22–23 (1st Cir.1992).

In the last analysis, courts must take a practical, commonsense view of the restrictions that constrain an agency's freedom to alter prior practices. Those restrictions, properly construed, do not lock an agency into a position where it invariably must parrot the same phrases or perpetually chant the same mantra. Reasonable refinement and reformulation are both permissible and advisable in administrative adjudication. Nothing more transpired here.

## V. THE STRESSED WATERS SHOWINGS

█ We now move from the procedural to the substantive. In scrutinizing an order of an agency denying an evidentiary hearing, a reviewing court must determine whether the agency's findings accurately mirror the record, and if they do, whether those findings warrant denial of a hearing under the pertinent regulations. *See Hynson,* 412 U.S. at 622, 93 S.Ct. at 2479. In this instance, the first part of the inquiry tells the tale, for, if PRASA failed to present evidence adequate to create a genuine issue of material fact on one or more critical criteria, as EPA found, then EPA properly denied the requested hearing.

### The Future Impacts Showing

█ Under 40 C.F.R. § 125.61(f)(3), it was incumbent upon PRASA to show, *inter alia,* that the emissions from the Mayaguez POTW would not "retard the recovery of the biota or water quality if the level of human perturbation from other sources decreases."

In promulgating this requirement, EPA recognized that it was erecting a high hurdle. Indeed, it stated in a preamble to the regulations:

> As a practical matter, it will be extremely difficult for most applicants discharging into stressed waters to demonstrate that their discharge will meet the requirements of section 125.61. As a factual matter, the discharge of additional pollutants into an already polluted marine environment virtually always increases or contributes to adverse impact; it is extremely difficult, as a practical matter, to demonstrate that it does not.

44 Fed.Reg. 34,784, 34,806 (June 15, 1979).

EPA concluded that PRASA had not cleared this hurdle, and the Board concurred. It noted that the studies submitted by petitioner—principally the USGS report—addressed only the current impacts of the facility's emissions relative to the current impacts of all other emissions, and did not purport to make predictions regarding future impacts. *See* Board Op. at 15–16. Accordingly, without defining exactly what type of evidence might surmount the (f)(3) hurdle, the Board determined that petitioner's effort came up short. If this determination holds water, then the agency had a right summarily to deny the petition.[10]

█ This reasoning finds a striking parallel in *Hynson.* There the Court agreed that an agency was not required to "provide a formal hearing where it is apparent at the threshold that the applicant has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations," *Hynson,* 412 U.S. at 620, 93 S.Ct. at 2478 (emphasis in the original). Spurred by *Hynson, see id.* at 621 n. 17, 93 S.Ct. at 2479 n. 17, FDA soon thereafter announced that, with regard to an imprecise regulation, a study would not conclusively be

---

10. PRASA makes a rather convoluted threshold argument that implicates the order of the showings which must be made to secure modification of secondary treatment requirements. In this case, we doubt that the order of the showings makes the slightest difference. Moreover, there is absolutely no basis for believing either that the showings must be made in a particular sequence, or that separate hearings must be held for each

showing. Absent a contrary indication in the regulation itself—and none exists here—we think it is fair to assume that a party must satisfy every element of a provision written in the conjunctive. *See WJM, Inc. v. Massachusetts DPW,* 840 F.2d 996, 1011 (1st Cir.1988); *Donovan v. Burger King Corp.,* 672 F.2d 221, 227 (1st Cir.1982); *see also* 1A Norman J. Singer, *Sutherland Stat. Constr.* § 21.14 (5th ed. 1993).

deemed inadequate unless it totally failed "even to attempt to comply." *See* 39 Fed. Reg. 9757 (Mar. 13, 1974). Since that time, the courts have upheld FDA's summary denials of hearings under this policy. As the District of Columbia Circuit explained:

> [E]ven "a regulatory provision which seems vague in the abstract may nonetheless be conclusively at odds with a peculiarly deficient item of evidence." Thus ... summary judgment may be entered not only for failure to comply with precise regulations, but also "on the basis of manifest noncompliance with general statutory or regulatory provisions...."

*Copanos*, 854 F.2d at 522 (citations omitted). We agree. Although in some cases an imprecise regulation may require an agency to give an applicant the benefit of the doubt regarding a summary decision, other cases will be so clear-cut as to warrant summary adverse action, notwithstanding the imprecision in the agency's standards. We believe the present case falls into the heartland of the latter category.

The Board's reasoning is also hauntingly reminiscent of *Buttrey v. United States*, 690 F.2d 1170 (5th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), a case involving the Clean Water Act. There, the court of appeals agreed that the Army Corps of Engineers need not hold a hearing on every application for a permit to discharge dredged or fill material into navigable waters. *Id.* at 1174–83. One reason given was that the petitioner

> apparently decided not even to attempt to make the three showings required under [the applicable regulations]. Procedural improvements in the nature of trial-type safeguards could do nothing to remedy so fundamental a flaw in the prima facie case.

*Id.* at 1183 (footnote omitted).

PRASA does not deny that its studies failed to draw direct conclusions regarding future impacts.[11] Instead, it attempts to discredit EPA's interpretation of the future im-

pacts regulation, labelling it absolutist. This fusillade misses the mark. Though an absolutist interpretation, rendering modifications of secondary treatment requirements for emissions into stressed waters unobtainable, might well be problematic, we do not read the Board's opinion in that fashion.

In considering this issue, the Board refused to presume, absent scientific evidence, that a large quantity of lightly treated sewage—estimated as 850 tons per year—would have no impact on the surrounding stressed waters in the event that other stresses abated. *See* Board Op. at 15–16. This neither betokens an absolutist mindset nor forecloses the possibility that the Board might entertain a presumption of no future harm if presented with the prospect of more modest emissions. Nor does the Board's opinion foreclose the possibility that it might find a scientific showing of no future impacts to be persuasive. On the contrary, after noting EPA's "great reluctance" to sanction emissions into stressed waters, the Board made a point of leaving the door ajar:

> This is not to say that there is no case where discharges into stressed waters would be allowed. Where, for example, the receiving waters are stressed by pollutants other than those in the proposed discharge and such pollutants do not contribute to existing stresses, a § 301(h) permit may be appropriate.

*Id.* at 18 & n. 22.

To say more would be to paint the lily. We conclude that EPA did not promulgate an absolutist standard. And, moreover, we find the Board's rendition of the evidence to be faithful to the record, its reasoning to be sound, and its position to be well-supported by authority. Consequently, we hold that the Board acted within its authority in denying petitioner an evidentiary hearing and summarily terminating the administrative appeal on the ground that the studies submitted by petitioner failed to make any attempt

---

11. PRASA does offhandedly suggest that its studies make the requisite showing *indirectly*. Compliance with (f)(1), PRASA muses, might in some cases provide a scientific basis for the prediction required by (f)(3). While that may (or may not) be so in theory, it is certainly not so on the facts of this case. Here, PRASA's showing of no current impacts was weak at best, *see infra* note 12, and cannot support the weight of the proposed inference.

to satisfy the strictures of 40 C.F.R. § 125.-61(f)(3).[12]

## VI. CONCLUSION

We need go no further. PRASA's application for modification and its concomitant request for an evidentiary hearing were fairly considered and appropriately rejected. For the reasons set forth herein, we uphold the agency's final action and deny PRASA's petition for review.

*It is so ordered.*

---

**12.** The Board gave an alternative reason for upholding EPA's refusal to convene an evidentiary hearing, ruling that petitioner failed to show that its discharge did not currently "contribute to, increase, or perpetuate ... stressed conditions." 40 C.F.R. § 125.61(f)(1) (1993). We need not pursue this point, for petitioner's failure to adduce hearing-worthy evidence on the future impacts prong is in itself enough to justify denying the instant petition for judicial review. We add in passing, however, that the record strongly suggests the correctness of the Board's conclusion on the current impacts prong as well.