Edwin F. ADAMS, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 94–1074.

United States Court of Appeals,
First Circuit.

Heard Aug. 5, 1994.

Decided Oct. 25, 1994.

Richard A. Kanoff, for petitioner.

Eileen T. McDonough, Environmental Defense Section, U.S. Dept. of Justice, with whom Lois J. Schiffer, Acting Asst. Atty. Gen., Environmental & Natural Resources Div., Jeffry T. Fowley, Office of Regional Counsel, and Stephen J. Sweeney, Office of General Counsel, U.S. Environmental Protection Agency, were on brief, for respondent.

Before TORRUELLA, Chief Judge, BOUDIN and STAHL, Circuit Judges.

TORRUELLA, Chief Judge.

Petitioner Edwin F. Adams requests review of final action taken by the United States Environmental Protection Agency ("EPA" or "the Agency"). Adams challenges the EPA's issuance of a National Pollution Discharge Elimination System ("NPDES") permit under the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. §§ 1251 *et seq.*, for the Town of Seabrook, New Hampshire ("Seabrook"). The NPDES permit allows the discharge of effluent from Seabrook's proposed municipal wastewater treatment facility. Adams alleges that the EPA failed to comply with its obligations under the Ocean Discharge Criteria of the Act, 40 C.F.R. § 125, Subpart M, which require that the EPA not allow "unreasonable degradation" from ocean discharges. Adams has not persuaded us that he was wrongfully denied an evidentiary hearing or that the Agency otherwise erred in its treatment of his objections. We therefore uphold the final action of the EPA and deny Adams' petition for review.

## I. BACKGROUND

### A. General Overview

Seabrook has undertaken the construction of a municipal wastewater treatment plant ("the plant") to resolve problems caused by failing septic systems within the town. Be-

cause Seabrook's septic systems were failing, effluent was flowing into Seabrook's coastal waters. This condition increased bacteria levels in the coastal waters, caused closure of coastal areas to shellfishing, and restricted the use of the waters for swimming. Seabrook's proposed plant would collect sewage that would otherwise be released from septic systems into the coastal waters.

The plant, to be constructed on Wright's Island in Seabrook, will consist of a collection and transportation system, a treatment facility, an ocean outfall, and sludge processing facilities. The plant will discharge its treated effluent in approximately 30 feet of water, at a distance approximately 2100 feet from the Seabrook coastline, about 1000 feet north of the New Hampshire/Massachusetts border.

### B. The Clean Water Act Statutory and Regulatory Framework

■ Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the reduction and eventual elimination of the discharge of pollutants into these waters. 33 U.S.C. § 1251(a); *Town of Norfolk v. United States Army Corps of Engineers,* 968 F.2d 1438, 1445 (1st Cir.1992). Under the Act, no pollutant may be emitted into this nation's waters unless a NPDES permit is obtained. *Puerto Rico Aqueduct & Sewer Authority v. U.S.E.P.A.,* 35 F.3d 600, 602 (1st Cir. 1994); *see* 33 U.S.C. §§ 1311(a), 1342.

NPDES permits are issued by the EPA or, in those jurisdictions in which the EPA has authorized a state agency to administer the NPDES program, by a state agency subject to EPA review. *American Petroleum Inst. v. E.P.A.,* 787 F.2d 965, 969 (5th Cir.1986); *see* 33 U.S.C. § 1342. NPDES permits contain 1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls, *see* 33 U.S.C. §§ 1311(b)(1)(A), 1314(b); and 2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet "water quality standards." *See* 33 U.S.C. §§ 1311(b)(1)(C) and 1312(a). *See*

*also American Paper Institute, Inc. v. U.S.E.P.A.,* 996 F.2d 346, 349 (D.C.Cir.1993).

Additionally, a NPDES permit for a discharge into a territorial sea or the ocean must incorporate Ocean Discharge Criteria ("ODC"). 33 U.S.C. §§ 1343(a) and (c)(1). *See American Petroleum Inst.,* 787 F.2d at 970. The EPA's ODC guidelines require it to determine, after considering a number of factors, whether a discharge will cause "unreasonable degradation" of the marine environment. *See* 40 C.F.R. §§ 125.120–125.124. The EPA will not issue an NPDES permit where it determines that the discharge will cause an unreasonable degradation of the marine environment. *See* 40 C.F.R. § 125.123(b)–(d). Discharges in compliance with state water quality standards "shall be presumed not to cause unreasonable degradation of the marine environment, for any specific pollutants or conditions specified in the variance or the standard." 40 C.F.R. § 125.122(b).

### C. The Procedural Framework

An applicant initiates the NPDES process when it files a permit application providing information regarding the planned facility and its proposed discharges. *See* 40 C.F.R. § 124.3. The applicant must also provide the EPA with certification from the state in which the discharge originates. 33 U.S.C. § 1341. By its certification, the state confirms that the discharge, as permitted, assures compliance with all applicable state water quality standards and, if necessary, specifies any additional effluent limitations, or other permit conditions, needed to ensure compliance with the state's water quality standards. *See id.;* 40 C.F.R. § 124.55.

The EPA then prepares and issues a draft permit and explanatory fact sheet. *See* 40 C.F.R. §§ 124.6, 124.8, and 124.56. The EPA gives public notice, which initiates a 30-day public comment period. *See* 40 C.F.R. § 124.10(a)(1)(ii) and (b)(1). During the public comment period, all persons who believe any condition of a draft permit is inappropriate must raise all reasonably ascertainable issues and arguments in support of their positions. 40 C.F.R. § 124.13. During this period, any interested person can request a

public hearing. 40 C.F.R. § 124.11. After the close of the public comment period, the Regional Administrator determines whether a final permit should be issued, based on the administrative record compiled during the public comment period. *See* 40 C.F.R. §§ 124.15, 124.18.

After the EPA issues a final permit decision, an interested party may request an evidentiary hearing to contest the resolution of any questions raised during the public comment period. *See* 40 C.F.R. § 124.74(a). The Regional Administrator then grants or denies the request for a hearing. *See* 40 C.F.R. § 124.75(a)(1).

If a Regional Administrator denies a request for an evidentiary hearing, the denial becomes final agency action within thirty days unless an appeal is made to the Environmental Appeals Board ("the EAB"). *See* 40 C.F.R. §§ 124.60(c)(5) and 124.91. An EAB order denying review renders the Regional Administrator's previous decision final. *See* 40 C.F.R. § 124.91(f)(1). Finally, once an EPA permit decision has become final, any interested person may obtain judicial review of the decision by petitioning for review in the Circuit Court of Appeals. 33 U.S.C. § 1369(b)(1).

### D. Seabrook's Permit Proceedings

In May 1988, Seabrook applied for an NPDES permit to allow the discharge of the treated wastewater from its proposed plant into the Gulf of Maine. The EPA reviewed the application, and on September 23, 1991, issued a draft permit approving such discharges.

The EPA determined that the proposed discharge would not unreasonably degrade the marine environment. The EPA found that the initial dilution and rapid dispersion of the discharge, combined with the anticipated lack of nonconventional pollutants, would make bioaccumulation of pollutants unlikely. The EPA therefore concluded that the various forms of marine life would not be adversely impacted. While the EPA recognized that a small area around the discharge site would have to be closed to shellfishing

pursuant to requirements of the United States Food and Drug Administration, because the Massachusetts Division of Marine Fisheries did not consider this area to be a significant shellfish resource, the EPA concluded that this closure would not represent a significant loss of use.[1] The EPA also noted that the construction of the plant could eliminate most of the closings of nearby bathing beaches necessitated by high concentrations of coliform bacteria that were believed to be caused by the failing septic systems in Seabrook.

In early September 1991, the EPA established a public comment period from September 25, 1991 through October 29, 1991, and scheduled public hearings for October 22 and 23, 1991, in both Seabrook and Salisbury, Massachusetts. On October 23, Adams, who owns a beach-front home on the Gulf of Maine, submitted a written comment presenting eight issues which he believed should be addressed.

On October 26, 1992, the State of New Hampshire certified that the Seabrook permit was consistent with state water quality standards.

On November 13, 1992, the EPA issued Seabrook's NPDES final permit for the treatment plant, after consideration of the administrative record, including the public comments and the state certification.

On December 16, 1992, Adams filed a request for an evidentiary hearing with the Regional Administrator. In this request, Adams raised several issues which he claimed established material issues of fact warranting an evidentiary hearing under 40 C.F.R. § 124.74. Specifically, Adams contended that:

1) The dilution calculations were incorrect and, even if the calculations were correct, the public was not protected from viruses, thereby violating 40 C.F.R. § 125.122(6).
2) The outfall of the treatment plan, as designed, "is not in the best interests of the United States or the Town of Seabrook" and would unreasonably depreciate the recreational value of the beach in violation of 40 C.F.R. § 125.121(e)(3), while

---

1. The closure zone was ultimately limited to New Hampshire waters.

benefitting only the few residents of Seabrook.

3) The closure of the zone immediately around the outfall to shellfishing violated a New Hampshire law and 40 C.F.R. § 125.122(7).

4) If the permit was to be issued, it should be amended to include conditions requiring Seabrook a) to post signs warning of the risk of viral infection, and b) requiring that divers periodically inspect the manifold for storm damage or other possible problems.

5) The state permit issued by the New Hampshire Wetlands Board was illegal under state law.

6) There was no evaluation of alternate locations for the outfall.

On January 5, 1993, the Regional Administrator denied Adams' request for a hearing after concluding that Adams had failed to raise material issues of fact with respect to his various challenges, as required by 40 C.F.R. § 124.75(a)(1).

Adams then petitioned the EAB for review of the Regional Administrator's denial of his request for an evidentiary hearing. The EAB denied the petition for review, concluding that Adams had failed to satisfy various procedural requirements with respect to raising objections to the final permit, including failing to raise issues during the public comment period, and failing to satisfy pleading requirements and raise material issues of fact which required a hearing, in his request for an evidentiary hearing.

Adams now appeals the Agency's final action to this Court.

## II. STANDARD OF REVIEW

Judicial review of the EPA's action in issuing a NPDES permit under the Act is governed by provisions set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, the applicable standard of review is whether the EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Puerto Rico Aqueduct & Sewer Authority*, 35 F.3d at 604; *Puerto Rico Sun Oil Co. v. U.S.E.P.A.*, 8 F.3d 73, 77 (1st Cir.1993). A

court should not set aside agency actions as arbitrary and capricious unless the actions lack a rational basis. *Caribbean Petroleum Corp. v. U.S.E.P.A.*, 28 F.3d 232, 234 (1st Cir.1994) (citations omitted). The scope of review under the "arbitrary and capricious" standard is therefore narrow, and a court should not substitute its judgment for that of the agency. *Caribbean Petroleum Corp.*, 28 F.3d at 234 (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)).

An agency is entitled to deference with regard to factual questions involving scientific matters in its own area of expertise. *Puerto Rico Aqueduct & Sewer Authority*, 35 F.3d at 604 (citations omitted). "Mixed questions of law and fact, at least to the extent that they are fact-dominated, fall under this rubric." *Id.* (citation omitted). Similarly, we defer to an agency's interpretation of a statute that it is charged with enforcing, and our deference increases when the agency interprets its own regulations. *Id.*

> Like other executive agencies acting within their respective bailiwicks, EPA is due substantial deference in interpreting and implementing the Clean Water Act—"so long as [its] decisions do not collide directly with substantive statutory commands and so long as procedural corners are squarely turned."

*Caribbean Petroleum Corp.*, 28 F.3d at 234 (quoting *Puerto Rico Sun Oil*, 8 F.3d at 77) (other citations omitted); *see generally Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

## III. ADAMS' CLAIM THAT THE EPA FAILED TO COMPLY WITH THE OCEAN DISCHARGE CRITERIA

In his petition for review, Adams claims that the Agency erred when it denied his request for an evidentiary hearing with respect to his contention that the EPA failed properly to consider the ODC when it issued the NPDES permit for the Seabrook plant. Specifically, Adams claims that 1) prior to issuing the permit, the EPA failed properly

to evaluate a number of relevant factors, including the location and design of the outfall, dilution limits, and the impacts of the discharge on human health and recreational uses; 2) the EPA improperly permitted a discharge which would result in unreasonable degradation; and 3) the EPA improperly issued a NPDES permit without considering local environmental conditions and without a required modification/revocation clause.[2]

The EPA claims that the EAB properly concluded that Adams failed adequately to raise these various contentions during the public comment period and Adams therefore has waived his right to pursue these challenges on their merits.

■ In reviewing agency action, this Court will not consider issues which a petitioner failed to present during the administrative process in accordance with the relevant procedural requirements. *See, e.g., Massachusetts Dep't of Public Welfare v. Secretary of Agriculture,* 984 F.2d 514, 524 (1st Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). We apply the doctrine of procedural default in the administrative context because it serves three purposes which are relevant here:

First, when the administrative agency is given an opportunity to address a party's objections, it can apply its expertise, exercise its informed discretion, and create a more finely tuned record for judicial review. . . .

A second reason for applying strict rules of procedural default in the administrative context is to promote judicial economy. . . . Finally, enforcing procedural default solidifies the agency's autonomy by allowing it the opportunity to monitor its own mistakes and by ensuring that regulated parties do not simply turn to the courts as a tribunal of first resort.

*Id.* at 523.

■ As a preliminary matter, we note that in his petition for review, Adams has meaningfully refashioned and refined his original objections to the EPA's permitting process which he raised during the course of the administrative process. When we review Adams' claims, we consider only the objections he raised during the administrative process.[3] *See id.* at 524; *cf. Smith v. Massachusetts Dept. of Corrections,* 936 F.2d 1390, 1397 n. 10 (1st Cir.1991) (finding that arguments not advanced in the court below cannot be raised for the first time on appeal). These original objections, which Adams continues to advance in this appeal, involve several issues regarding the EPA's alleged failure to properly evaluate the ODC: the location and design of the outfall, the EPA's calculation of dilution limits, and whether the EPA properly considered the impact of the discharge on the public's health and shellfishing.[4]

With respect to Adams' contentions that the EPA failed to comply with ODC regulations when issuing the permit to the Seabrook plant, the Regional Administrator con-

---

2. 40 C.F.R. § 125.123(d) requires a clause in a NPDES permit which allows for the modification or revocation of any permit if continued discharge causes unreasonable degradation. The regulation only requires this clause, however, if the EPA has insufficient information to determine whether there will be unreasonable degradation at the time it issues the permit. *See id.;* 40 C.F.R. § 125.123(c). While this regulation does not appear to apply to the Seabrook permit, because the EPA did not find that it had insufficient information when it issued the permit, Adams argues that the Seabrook permit should include such a revocation/modification clause. Because Adams did not raise this contention in his request for an evidentiary hearing, as we will discuss, he has forfeited this claim.

3. Adams' petition for review to the EAB similarly embellished the objections he made in his origi-

nal evidentiary request to the Regional Administrator. The EAB could not address these refined objections for the first time on Adams' appeal to it. *See In re Matter of Broward County, Florida,* NPDES Appeal No. 92–11, 18, n. 29 (1993). ("the lack of requisite specificity in the evidentiary hearing request cannot be cured by providing greater specificity, for the first time, on appeal.").

4. In his original evidentiary request, Adams also claimed that the state permit issued by the New Hampshire Wetlands Board was illegal under state law. The Agency denied Adams' request because it found that this was an issue of state law not appropriately before the EPA. Adams does not now raise this argument in his petition for review.

cluded that Adams had failed to raise issues of material fact having to do with outfall location, dilution limits, and the effect of the discharge on health and shellfishing, which justified an evidentiary hearing. In deciding to deny review of this decision, the EAB found that Adams had not properly raised the issue of ODC compliance during the public comment period. Therefore, the EAB did not reach the question of the adequacy of Adams' evidentiary request. Consequently, we must first determine whether the Agency arbitrarily or capriciously barred Adams from raising these issues because of a procedural default, either because he failed to raise the issues at the public comment stage, or in his request for an evidentiary hearing.[5]

## A. The Public Comment Period

When the EPA promulgated its procedural regulations governing the public comment period, the Agency anticipated that most policy and technical issues would be decided as part of the public comment period, which is the most open, accessible forum possible and which comes at a stage where the Agency has the greatest ability to modify a draft permit. 44 Fed.Reg. 32,885 (1979). Pursuant to 40 C.F.R. § 124.13, "all persons ... who believe any condition of a draft permit is inappropriate or that the Director's tentative decision to ... prepare a draft permit is inappropriate, must raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position by the close of the public comment period," in order to contest a final permit determination in an evidentiary hearing or to preserve an issue for review by the EAB. Additional-

ly, 40 C.F.R. § 124.76 provides that "[n]o issues shall be raised by any party that were not submitted to the administrative record ... as part of the preparation of and comment on a draft permit unless good cause is shown for the failure to submit them."

These regulations are intended to alert the EPA to potential problems with the draft permit and to ensure that it has an opportunity to address those problems before the permit becomes final. *In the Matter of Broward County, Florida,* NPDES Appeal No. 92–11, 11 (1993). The regulations essentially require that:

[c]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made ...; it must show why the mistake was of possible significance in the results.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978) (citations omitted). This threshold of materiality standard is satisfied when comments are presented in a way which could reasonably have permitted the agency to examine those contentions. *Northside Sanitary Landfill, Inc. v. Thomas,* 849 F.2d 1516, 1520–21 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989).[6]

When construing this standard, it must be considered in the context of the broad purpose of the public participation rules.

Public participation in the development, revision, and enforcement of any regula-

---

5. We note that by virtue of the EAB's denial of Adams' petition for review, the Regional Administrator's initial decision constituted final agency action. *See* 40 C.F.R. § 124.91(f). Because the EAB premised its denial of review, in part, on Adams' alleged failure to raise the issue of the EPA's compliance with the ODC in the public comment period, and because the EPA advances this as the grounds to uphold the Agency's final action, we will address this contention.

6. While in some circumstances a petitioner's burden to present its challenges will be straightforward and fairly easy to satisfy, it should be noted that a petitioner's responsibility to present its position and contentions becomes heavier when asking an applicant for a permit or an

agency to "embark upon an exploration of uncharted territory." *Citizens for Clean Air v. U.S.E.P.A.,* 959 F.2d 839, 846–47 (9th Cir.1992) (finding that EPA's decision that petitioner failed to satisfy threshold of materiality standard was correct, when petitioner requested applicant to consider recycling as a best available control technology, which involved "uncharted territory," and the petitioner's suggestion alone, which lacked specific or quantifiable support, could require the applicant to undertake time-consuming costly studies; *see Vermont Yankee Nuclear Power,* 435 U.S. at 553, 98 S.Ct. at 1216. Here, Adams' objections do not present such an exploration of uncharted territory.

tion, standard, effluent limitation, plan or program established by the Administrator or any State under this chapter shall be provided for, encouraged and assisted by the Administrator and the States.

33 U.S.C. § 1251(e). Congress enacted public participation rules understanding that "these regulations would do more than pay lip service to public participation; instead '[t]he public must have a genuine opportunity to speak on the issue of protection of its waters' on federal, state and local levels." *Natural Resources Defense Council, Inc. v. U.S.E.P.A.*, 859 F.2d 156, 177 (D.C.Cir.1988) (citations omitted) (construing public participation regulations in state enforcement process). The legislative history of the CWA also echoes the desire "that its provisions be administered and enforced in a fishbowl-like atmosphere." *Id.* at 175 (citing Environmental Policy Division, Congressional Research Service, Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, at 249).

 We believe that the EAB's determination that Adams failed properly to raise his concerns regarding the EPA's compliance with the ODC during the public comment period was not supported by the evidence and lacked a rational basis. A careful review of the record indicates that Adams and other participants in the public comment period submitted statements which satisfied the threshold requirement of materiality by alerting the EPA to their concern that the EPA had not adequately complied with the mandates of the ODC when it issued the draft permit to the Seabrook plant.[7] In his written comments to the EPA during the public comment period, Adams raised the following concern:

> The E.P.A. has not carried out the intent of Congress in relation to the Water Quality Act of 1987, Public Law 100–4, 125–122, 125–123, 125–124, 227–27. Therefore, it is

impossible for the Town to comply with the intent of Congress.

With his references to the public laws, Adams specifically refers to the ODC. Additionally, Adams' written comments indicate that he challenged the design and location of the outfall, and the accuracy of information presented by the Town engineers regarding the outfall. Adams also questioned whether the dilution calculations were correct. Finally, Adams, as well as other participants, raised concerns about the detrimental impact the outfall would have on the beaches, and on shellfish and other marine life.

 The public comments do not present technical or precise scientific or legal challenges to specific provisions of the draft permit. The purpose of the regulation requiring participants to raise ascertainable issues, however, is not to foreclose participation in the process, but to provide notice to the EPA so that it can address issues in the early stages of the administrative process. *See* 44 Fed.Reg. 32,885 (1979); *In the Matter of Broward County, Florida*, NPDES Appeal No. 92–11, 11 (1993). It would be inconsistent with the general purpose of public participation regulations to construe the regulations strictly. Such a strict construction would have the effect of cutting off a participant's ability to challenge a final permit by virtue of imposing a scientific and legal burden on general members of the public who, initially, simply wish to raise their legitimate concerns regarding a wastewater facility that will affect their community, in the most accessible and informal public stage of the administrative process, where there is presumably some room for give and take between the public and the agency. We believe that Adams and the other participants adequately raised their objections during the public comment period, and conclude that the EAB ignored the record and acted arbitrarily and capriciously when it found that Adams had failed to do so.[8]

---

7. The regulations require that in order to preserve an issue, it must be raised by any party during the comment period. *See* 40 C.F.R. § 124.76. The person filing the petition for review, however, does not necessarily have to be the individual who raised the issue during the comment period. *In the Matter of Broward*

*County, Florida*, NPDES Appeal No. 92–11, 11–12 (1993).

8. Following the public comment period, the Agency issued a "Response to Comments" as required by 40 C.F.R. § 124.17. This regulation requires that the agency "[b]riefly describe and respond to all significant comments on the draft

## B. Adams' Request for an Evidentiary Hearing

### 1. Procedural Requirements

Procedurally, the evidentiary hearing process was designed to address "contested factual issues" requiring cross-examination. 44 Fed.Reg. 32,885 (1979). As we stated earlier, following the EPA's issuance of a final permit, the relevant regulations allow a participant to request an adjudicatory hearing. The regulations have specific pleading requirements mandating that requests "state each legal or factual question alleged to be at issue, and their relevance to the permit decision, together with a designation of the specific factual areas to be adjudicated and the hearing time estimated to be necessary for adjudication." 40 C.F.R. § 124.74(b)(1). Additionally, the request shall contain "[s]pecific references to the contested permit conditions, as well as suggested revised or alternative permit conditions . . . which in the judgment of the requester, would be required to implement the purposes and policies of the CWA." 40 C.F.R. § 124.74(c)(5).

Beyond satisfying these pleading requirements, 40 C.F.R. § 124.75(a)(1) requires that requests for an evidentiary hearing set forth "material issues of fact relevant to the issuance of the permit." The EPA has construed this regulation as an administrative summary judgment standard, and has required an applicant to present a genuine and material factual dispute in order to be entitled to an evidentiary hearing. We have recently upheld the EPA's construction of this regulation, finding that the regulations "lawfully can be read to incorporate this binary test, featuring genuineness and materiality." *Puerto Rico Aqueduct and Sewer Authority,* 35 F.3d at 605. In applying this standard, we noted that Fed.R.Civ.P. 56 "is the prototype for administrative summary judgment procedures, and the jurisprudence that has grown up around Rule 56 is, therefore, the most fertile source of information about administrative summary judgment." *Id.* at 15.

### 2. The Substantive Law

■■■■ In order to determine what facts are material, we must look to the controlling substantive law. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Pursuant to the ODC regulations, the EPA is required to determine whether a discharge will cause unreasonable degradation of the marine environment. *See* 40 C.F.R. § 125.123.[9] Alternatively, dis-

---

permit . . . raised during the public comment period. . . ." 40 C.F.R. § 124.17. In this response, the EPA stated that it had in fact, assessed relevant dilution limits and the Seabrook plant's impact on shellfishing, the impact on beaches, and health risks associated with the discharge. The EPA also responded that the outfall location and the proposed level of effluent treatment met existing EPA criteria and standards. Despite Adams' contention to the contrary, this response, in light of the nature of the public comments, was entirely adequate.

9. The EPA determines whether or not a discharge will cause unreasonable degradation based on a consideration of the following:

1) The quantities, composition, and potential bioaccumulation or persistence of the pollutants to be discharged;
2) The potential transport of the pollutants by biological, physical, or chemical processes;
3) The composition and vulnerability of potentially exposed biological communities, including the presence of unique species or communities of species, endangered or threatened species; and species critical to the structure or function of the ecosystem;
4) The importance of the receiving water area to the surrounding biological communities, including the presence of spawning sites, nursery/forage areas, migratory pathways, areas necessary for critical life stages and functions of an organism;
5) The existence of special aquatic sites, including marine sanctuaries, parks, monuments, national seashores, wilderness areas, and coral reefs;
6) Potential direct or indirect impacts on human health;
7) Existing or potential recreational and commercial fishing;
8) Any applicable requirements of an approved Coastal Zone Management Plan;
9) Such other factors relating to the effects of the discharge as may be appropriate;
10) Marine water quality criteria.
*See* 40 C.F.R. § 125.122(a). "Unreasonable degradation" of the marine environment is defined as any of the following:
1) Significant adverse changes in ecosystem diversity, productivity, and stability of the bio-

charges in compliance with "State water quality standards shall be presumed not to cause unreasonable degradation of the marine environment, for any specific pollutants or conditions specified in the variance or the standard." 40 C.F.R. § 125.122(b). While this presumption is rebuttable, the EPA is entitled to rely upon it unless available data indicates that a discharge would in fact cause unreasonable degradation. 45 Fed.Reg. 65,-945 (1980).

In this case, the State of New Hampshire certified that the degradation caused by the Seabrook plant was consistent with New Hampshire water quality standards. The EPA relied on New Hampshire's certification in issuing Seabrook's final permit.

### 3. Adams' Evidentiary Request

 In his evidentiary hearing request, Adams had the burden to point to evidence in the administrative record which would rebut the presumption that the discharge from the Seabrook plant would not cause unreasonable degradation. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed.Cir.1992). In his request, Adams challenged the location and design of the outfall and the calculation of the dilution limits, and claimed that the permitted discharge would threaten human health and cause a significant shellfish closure zone. Adams did not point to any evidence in the record which indicated that New Hampshire erroneously granted its certification, or that the EPA could not rely on this certification because available data indicated that the discharge from the plant would, in fact, cause unreasonable degradation of the marine environment. We hold that the EPA did not act arbitrarily or capriciously in finding that each of Adams' challenges failed to present a genuine issue of material fact showing that the EPA was not entitled to rely on the regulatory presumption.

In what follows, we address Adams' specific contentions, showing why each individually is procedurally deficient.[10]

### a. The Outfall Design and Location

 In his request for an evidentiary hearing, Adams stated:

> This outfall as designed is not in the best interests of the United States or the Town of Seabrook. If for no other reason the permit should be denied on this basis. It simply is not in anyone's interest to have the people of the United States swimming in sewerage water even if has been bleached so as to be invisible.

> If there were any benefit to this outfall at all it would only be to the residents of Seabrook who would use the sewer and cared not about the Beach or the beach environment. There certainly would be no benefit to citizens of the rest of the United States, but on the contrary, anyone that used the beach would be more at risk to viral diseases or just the knowledge of swimming in filth is certainly no benefit and compared to the cleanliness that exists at the beach now, the depreciation of recreational value (as in 40 C.F.R. §§ 125.121(3)) is not reasonable in relation to the small benefit to a few.

Adams also claimed that the EPA failed to consider alternative sites for this outfall. In response, the Regional Administrator denied Adams' request, explaining that Adams had failed to raise a genuine issue of material fact regarding outfall location which justified an

logical community within the area of discharge and surrounding biological communities;
2) Threat to human health through direct exposure to pollutants or through consumption of exposed aquatic organisms; or
3) Loss of aesthetic, recreational, scientific or economic values which is unreasonable in relation to the benefit derived from the discharge.
40 C.F.R. § 125.121(e)(1–3).

**10.** In his evidentiary hearing request, Adams requested that two conditions, warning signs and visual inspections, be added to the permit. Adams does not appear to advance that contention here in his petition for review. With respect to this request, however, we do not believe that the Agency arbitrarily or capriciously concluded that the inclusion of these permit conditions was not within the scope of issues raised during the public comment period, and that Adams failed to establish that he had good cause for not raising both of these issues at the appropriate time.

evidentiary hearing. The EAB did not then disturb this determination.[11]

The Agency did not act arbitrarily or capriciously in denying Adams' request for an evidentiary hearing. Adams' evidentiary request is completely bereft of any references to facts in the record which would create a "genuine" issue that a discharge from the planned outfall location would cause unreasonable degradation of the marine environment, which would be sufficient to rebut the regulatory presumption. Rather, Adams offered a conclusory opinion that the outfall, as designed, was not in the best interest of Seabrook or the United States because it was not in anyone's interest to have people swimming in sewage. This is not sufficient to warrant a formal evidentiary hearing.

Adams also suggested that the EPA erred because, based on the planned outfall location, the depreciation of the recreational value was not reasonable in relation to the benefits, referring to 40 C.F.R. § 125.121(e)(3). This regulation partially defines unreasonable degradation of the marine environment as the "[l]oss of esthetic, recreational, scientific or economic values which is unreasonable in relation to the benefit derived from the discharge." *Id.* Adams' request for a hearing, however, simply tracked the language of the regulation and stated his ultimate conclusion that the depreciation of the recreational value was not reasonable in relation to the benefits. The only rationale Adams offered for this conclusion was the unsupported statement that there can be no benefit to anyone when people would be swimming in filth and subjected to a greater risk of viral diseases. Adams has completely failed to point to any evidence showing that the proposed discharge from the outfall would cause the loss of any recreational value, much less evidence that would indicate that there was a "genuine" factual dispute that such a loss would be unreasonable in relation to the benefits to be derived from the discharge. *See* 40 C.F.R. § 125.121(e)(3). We agree with the EPA that Adams has not tendered any evidence which on its face creates a genuine issue of material fact showing that the EPA's reliance on the state certification was improper, and we believe that the EPA properly denied the requested hearing. *See, e.g., Puerto Rico Aqueduct & Sewer Authority,* 35 F.3d at 609–11.

**b. The Dilution Calculations**

Adams contends that the Agency should have granted his request for an evidentiary hearing on the issue of whether the EPA properly calculated the dilution limits of the effluent. A generous reading of Adams' evidentiary request indicates that he believed that the EPA improperly calculated dilution limits and, because of these improper calculations, the EPA failed properly to consider the effect of viruses on marine life and the viruses' indirect effect on humans. Additionally, Adams claimed that even if the EPA properly calculated the dilution limit, the Agency still failed to evaluate the effect of viruses. Adams stated that this was a direct violation of 40 C.F.R. § 125.122(a)(6), which required the rescission of the entire permit.

The Regional Administrator denied Adams' request because he failed to raise a genuine issue of material fact. The EAB did not disturb this finding.

As a preliminary matter, as we have previously noted, the EPA relied on the New Hampshire state certification when it issued the Seabrook permit. When Seabrook applied for its permit, the New Hampshire Department of Environmental Services ana-

11. In his petition for review, Adams does not appear to argue that the EPA's alleged failure to consider alternative sites for the outfall was in itself a violation of any statute or regulation. We note, however, that the Agency stated that the EPA is not required to evaluate alternative sites for an outfall that meets CWA requirements unless review is required under the National Environmental Policy Act ("NEPA"). *See* 33 U.S.C. § 1371(c); 42 U.S.C. § 4321 *et seq.* Adams did not challenge this determination. There also does not appear to be any dispute that the Sea-brook permit is exempt from the NEPA requirements because no federal funding is involved in the plant, and because the plant is not a new source as defined in the CWA. *See Natural Resources Defense Council, Inc. v. U.S.E.P.A.,* 859 F.2d 156, 167 (D.C.Cir.1988). Because the EPA had no legal obligation to consider alternative locations for the outfall involved in the permit, the Agency did not act arbitrarily or capriciously in finding that no genuine issue of material fact was raised by Adams' objection that the EPA did not consider such locations.

lyzed the draft permit to ensure that the permit effluent conditions were stringent enough to assure that the discharge would not violate state water quality standards, which were designed to protect public health and recreational activities in and on the water. *See* N.H.Code Admin.R. [N.H. Dept. of Environmental Services, Water Supply & Pollution Control Div.] Env–Ws 430.01 (1990) (stating that New Hampshire's water quality standards are "intended to protect public health and welfare" and provide for "the protection and propagation of a balanced indigenous population of fish, shellfish, and other aquatic organisms and wildlife, and provide for such uses as recreational activities in and on the waters"). The New Hampshire Department of Environmental Services then concluded that if the permit was modified to incorporate a maximum daily total coliform limit to be measured on a daily basis, state certification would be granted. According to the state certification, the mandated coliform limit was necessary because the affected water was "used for the growing or taking of shellfish for human consumption." The EPA then incorporated the required coliform limits when it issued the final permit.

The EPA did not act arbitrarily or capriciously when it found that Adams failed to show why the EPA's reliance on New Hampshire's certification, which provided for coliform limits to protect the public's health, was inadequate. Adams failed to point to data in the record which established that the proposed discharge would cause unreasonable degradation of the marine environment, because the discharge would threaten human health through direct or indirect pathways, through the presence of viruses. *See* 40 C.F.R. §§ 125.122(a)(6), 125.121(e)(2). Rather, Adams simply believed that the EPA should establish effluent limits for viruses as an alternative or additional measure to protect human health. The EPA pointed out, however, that New Hampshire regulates coliform bacteria as an indicator for the presence of human wastes, and this limit was designed to protect the designated uses of swimming, fishing, and other recreational purposes. Additionally, the Regional Administrator noted that: "[i]t is EPA's judgment that attempting to establish a separate virus effluent limit here would be inadvisable due to, among other things, problems in detection relating to their small size, low concentrations, variety and instability in the presence of interfering solids, and limits on availability of identification methods." The EPA found, and we agree, that Adams did not point to any evidence from which a decisionmaker could find that the State of New Hampshire failed properly to evaluate the discharge's effect on human health because it did not require effluent limits for viruses.

To support his statement that the EPA improperly calculated dilution limits, Adams relied on a September 4, 1991 letter from Martin Dowgert, a Regional Shellfish Specialist with the FDA to Mr. Richard Roach of the U.S. Army Corps of Engineers ("the FDA letter"), which was a part of the administrative record.[12] The FDA letter calls for the establishment of a larger safety zone closed for shellfishing around the proposed treatment plant outfall, and an area subject to conditional closure in the event of plant disinfection failure. To support his opinion that a larger safety zone needed to be created, Dowgert stated that based on the FDA's preliminary assessment, a shellfish closure zone would occur in an area represented by a 1000:1 dilution line, and this zone would be an area 4,000 feet from the outfall. Adams claimed that this reference was at odds with dilution limits used by the EPA, which Adams failed to specify.[13]

12. Specifically, in his evidentiary request, Adams stated:

As it is generally accepted and also pointed out in a certain letter from the F.D.A. to a Mr. Richard Roach ... the remedy to high virus populations is very high dilutions (1/1,000,-000,000) or more.

The letter in the above paragraph also estimates that a 1/1,000 dilution would not occur until 4,000 feet from the manifold where as the beach is only 1200 feet at low tide when the dilutions are apt to be lowered.

13. In his evidentiary request, Adams also stated that no study was done with respect to the effect of viruses on children playing in the water at the beach "which will contain only 318.5 parts water to each part of filth laced with viruses." Adams did not provide any citation as to where this dilution figure came from or how it was arrived

The EPA did not construe Adams' reference to the FDA letter as raising a genuine issue of material fact regarding the dilution limits, noting that the FDA did not call for the NPDES permit to be denied, or for a revision of any term of the NPDES permit. We do not believe that this finding was arbitrary or capricious because Adams did not show how this alleged miscalculation was material to the permitting process. Subsequent to the FDA letter, New Hampshire issued its certification after evaluating the effects of the discharge and concluding that if its maximum coliform limits were incorporated, the discharge would satisfy state water quality criteria. The EPA then incorporated those limits, requiring that the Seabrook plant comply with them. Adams did not point to anything in the FDA letter which called into question New Hampshire's mandated coliform limits. Rather, Adams claimed that the EPA originally miscalculated dilution limits, but then failed to show what the effects of the alleged miscalculation were, or how the alleged miscalculation affected the New Hampshire certification process.

### c. The Shellfish Closure Zone

■ In his evidentiary request, Adams stated that the planned closure of a small area around the outfall to shellfishing was contrary to New Hampshire law, which provides that it is for the public good of the state to protect and preserve its submerged lands under tidal waters from despoliation. *See* RSA 482–A:1 (1993).[14] Beyond this alleged violation of state law, Adams argued that because New Hampshire "has a very small and limited total area for shellfish beds ... a loss of a very small area is a significant net loss," which would therefore be unlawful under 40 C.F.R. § 125.122(a)(7).[15] To support his contentions, Adams seemed to rely indirectly on the FDA letter, which suggested that the size of the closed safety zone should extend to an area 4,000 feet from the outfall.

The Regional Administrator denied Adams' request on the grounds that he only raised conclusory policy and legal issues, rather than specifying material factual disputes which were entitled to consideration in an evidentiary hearing. The EAB concurred.

We do not believe that the Agency acted arbitrarily or capriciously in denying Adams' request. Adams again has challenged the EPA's reliance on the New Hampshire certification, which was issued after New Hampshire determined that the state's water quality standards, which protect the commercial and recreational value of shellfishing, would not be contravened. *See* N.H.Code Admin.R. [N.H. Dept. of Environmental Services, Water Supply & Pollution Control Div.] Env–Ws 430.01 (1990). Adams' claim that the discharge as permitted is unlawful under RSA 482–A:1, represents a disagreement with the State of New Hampshire's ultimate legal conclusion that the discharge from the Seabrook plant would be lawful under specific provisions of New Hampshire's law. Adams failed to indicate what specific provision of law New Hampshire ignored or ill-considered. Adams also failed to point to any evidence showing

---

at. We do not believe that this bare statement was sufficient to create a genuine factual dispute which would require a formal evidentiary hearing on the issue of dilution calculations.

14. R.S.A. 482–A:1 (1993), New Hampshire's Water Management and Protection law, provides in pertinent part:

It is found to be for the public good and welfare of this state to protect and preserve its submerged lands under tidal and fresh waters ... from despoliation and unregulated alteration, because such despoliation or unregulated alteration will adversely affect the value of such areas as sources of nutrients for finfish, crustacea, shellfish and wildlife of significant value, will damage or destroy habitats and reproduction areas for plants, fish and wildlife of importance, will eliminate, depreciate or obstruct the commerce, recreation and aesthetic enjoyment of the public, will be detrimental to adequate groundwater levels, will adversely affect stream channels and their ability to handle the runoff of waters, will disturb and reduce the natural ability of wetlands to absorb flood waters and silt, thus increasing general flood damage and the silting of open water channels, and will otherwise adversely affect the interests of the general public.

15. 40 C.F.R. § 125.122(a)(7) provides that the EPA shall determine whether a discharge will cause unreasonable degradation of the marine environment based on the consideration of existing or potential recreational and commercial fishing, including shellfishing.

**58**

that a provision of New Hampshire law was, in fact, violated.

Adams next argues that the shellfish closure zone would cause an unreasonable degradation of the marine environment under 40 C.F.R. § 125.122(a)(7). To establish that this shellfish closure zone would constitute an "unreasonable degradation," Adams would need to show that the closure zone produced a loss of recreational or economic values which was "unreasonable in relation to the benefit derived from the discharge." 40 C.F.R. § 125.121(e)(3). Adams attempted to show this by offering his conclusory opinion that because New Hampshire had a limited total area for shellfish beds, the closure of any area must be "significant." Adams failed to point to any facts, however, which showed that the closure zone would cause a loss of any recreational or economic value, much less that such an alleged loss would be unreasonable in relation to associated benefits.

We do not believe that the FDA letter materially supported Adams' contention. The FDA letter stated that the shellfish closure zone needed to extend 4,000 feet from the outfall. The FDA letter, however, does not expressly state, or otherwise suggest, that such a closure zone would constitute an *unreasonable* degradation of the marine environment. *See* 40 C.F.R. § 125.121.(e). The EPA did not act arbitrarily or capriciously in determining that Adams had failed to raise a genuine issue of material fact which justified an evidentiary hearing.

For the foregoing reasons, Adams petition is *denied.*