<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 99-1855

                 SUR CONTRA LA CONTAMINACI N,

                          Petitioner,

                               v.

                ENVIRONMENTAL PROTECTION AGENCY,

                          Respondent,

                              and

                     AES PUERTO RICO L.P.,

                          Intervenor.

                      ____________________

                
             PETITION FOR REVIEW OF A FINAL ACTION
             OF THE ENVIRONMENTAL PROTECTION AGENCY

                      ____________________
                     
                             Before

                    Lynch, Circuit Judge,
               Campbell, Senior Circuit Judge,
                  and Stahl, Circuit Judge.
                                
                      ____________________

 Pedro J. Varela for petitioner.
 Michele L. Walter, with whom Lois J. Schiffer, Assistant
Attorney General, Environment and Natural Resources Division, Alice
L. Mattice, Attorney, Environmental Defense Section, U.S.
Department of Justice, M. Lea Anderson, Attorney, Office of General
Counsel, U.S. Environmental Protection Agency, and Joseph A.
Siegel, Office of Regional Counsel, U.S. Environmental Protection
Agency, Region II, were on brief, for respondent.
 Deborah E. Jennings, with whom Monica D. Gibson and Piper
Marbury Rudnick & Wolfe LLP were on brief, for intervenor.

                      ____________________
                     

                      ____________________

 LYNCH, Circuit Judge.  Sur Contra la Contaminacin
(SURCCo), a community organization made up of residents of Guayama,
Puerto Rico, challenges a Prevention of Significant Deterioration
(PSD) permit, issued by the Environmental Protection Agency, that
authorizes construction of a power plant in the ward of Jobos
within that municipality.  The group contends that the Agency's
decision to grant the permit was arbitrary and capricious and in
violation of the Executive Order on Environmental Justice.  See
Federal Actions To Address Environmental Justice in Minority
Populations and Low-Income Populations, Exec. Order No. 12,898, 59
Fed. Reg. 7629 (1994).  The Environmental Appeals Board carefully
considered the challenge and denied it.  See In re AES Puerto Rico,
L.P., 29 Envtl. L. Rep. (Envtl. L. Inst.) 41,132 (Envtl. App. Bd.
May 27, 1999).  For the following reasons, we, too, reject the
challenge.  
                               I.
 On January 10, 1996, Region II of the EPA received a PSD
permit application from AES Puerto Rico L.P. for a 454-megawatt
coal-fired, steam-electric cogeneration power plant it wished to
build in Guayama.  The permit was required under the Clean Air Act
because the plant would be a major new stationary source of certain
pollutants, including sulfur dioxide and fine particulate matter.  
See 42 U.S.C.  7475, 7479; 40 C.F.R.  52.21(b)(1)(i)(a).  PSD
permits are designed to insure that covered pollutants emitted by
new or modified sources do not exceed the allowable increments of
additional air pollutants (the increments) or lead to the exceeding
of the National Ambient Air Quality Standards (the Standards) in
areas that have been designated "attainment" or "unclassifiable."  
See 42 U.S.C.  7471, 7473.  The PSD program represents a
balancing of "economic growth" with the "preservation of existing
clean air resources."  Id.  7470(3).
 Before the EPA grants a PSD permit, the owner or operator
of the proposed facility must satisfy certain prerequisites, two of
which are of importance here.  First, a permit will be issued only
if the owner "demonstrates . . . that emissions from construction
or operation of such facility will not cause, or contribute to, air
pollution in excess" of the increments or the Standards.  42 U.S.C.
7475(a)(3); 40 C.F.R.  52.21(k).  This is accomplished through
air quality modeling and ambient air monitoring, see 40 C.F.R.
52.21(l), (m), though the extensiveness of these two inquiries
can vary.  According to the EPA's draft New Source Review Workshop
Manual, "a full impact analysis," including "multi-source
modeling," i.e., air quality modeling that takes into account the
proposed source, existing sources, and residential, commercial, and
industrial growth that accompanies the new source, for a particular
pollutant is not required "when emissions of that pollutant from a
proposed source . . . would not increase ambient concentrations by
more than prescribed significant ambient levels."  Further, the EPA
may waive the air monitoring requirement if "[t]he emissions
increase of the pollutant from the new source . . . would cause, in
any area, air quality impacts less than" certain de minimis
monitoring levels.  40 C.F.R.  52.21(i)(8)(i).  
 Here, AES used EPA-approved air quality modeling
techniques to predict emissions of both sulfur dioxide and fine
particulate matter from the proposed plant.  The predicted sulfur
dioxide emissions were all below the thresholds, though the one for
the twenty-four hour averaging time came very close to the
significant impact level (.03 micrograms per cubic meter below the
threshold).  As a result, the Region did not require AES to conduct
a full impact analysis and exempted AES from conducting
preconstruction ambient air monitoring for sulfur dioxide.  The
predicted fine particulate matter emissions, however, were above
the designated significant impact levels and de minimis monitoring
levels, so the EPA required AES to conduct a full impact analysis
and ambient air monitoring of that pollutant.  Both of these
analyses were conducted and both indicated that the proposed plant
would not cause or contribute to a violation of the Standards or
the PSD increments.  
 Second, a permit will not be issued unless the "proposed
facility is subject to the best available control technology
[(BACT)] for each pollutant subject to regulation."  42 U.S.C.
7475(a)(4).  BACT "means an emissions limitation . . . based on
the maximum degree of reduction for each pollutant subject to
regulation under [the] Act which would be emitted from any proposed
major stationary source . . . which the Administrator, on a case-
by-case basis, taking into account energy, environmental, and
economic impacts and other costs, determines is achievable for such
source . . . through application of production processes or
available methods, systems, and techniques . . . ."  40 C.F.R.
52.21(b)(12).
 AES proposed a novel combination of three proven control
technologies: circulating fluidized bed boilers with limestone
injection; low sulfur coal; and a dry scrubber.  The company claims
that this combination will lead to "one of the world's cleanest
coal-fired power plants."  Though this combination has not been
used before, the EPA believes that this control technique is
"technically feasible" and "will result in a real decrease in
impacts."  It, therefore, accepted the combined technologies as the
BACT.  
 On April 4, 1997, the Region published a notice that
announced its intention to issue the PSD permit to AES.  As
required, the Region conducted public hearings and received written
submissions, which it reviewed.  See 42 U.S.C.  7470(5),
7475(a)(2).  In response to the community's concerns, the EPA
conditioned the permit on AES's conducting post-permit multi-source
modeling and ambient air monitoring of sulfur dioxide, even though
these tests were not required by the Act or the regulations.  
Also, the EPA prepared an environmental justice analysis.  See
Exec. Order No. 12,898, 59 Fed. Reg. 7629 (1994).  On September 18,
1998, the Region issued the PSD permit.  A number of individuals
and groups, including SURCCo, challenged the petition before the
Environmental Appeals Board.  The Board, on May 27, 1999, denied
these petitions for review.  See In re AES, 29 Envtl. L. Rep. at
41,132.  SURCCo now brings this petition.
                              II.
 We have jurisdiction to review this petition.  See 42
U.S.C.  7607(b)(1); 40 C.F.R.  124.19(f)(1).  Our review of the
permit is governed by the Administrative Procedure Act's "arbitrary
and capricious" standard.  See 5 U.S.C.  706(2)(A); Pan Am. Grain
Mfg. Co. v. U.S. EPA, 95 F.3d 101, 105 (1st Cir. 1996) (reviewing
state implementation plan); Adams v. U.S. EPA, 38 F.3d 43, 49 (1st
Cir. 1994) (reviewing NPDES permit); Citizens for Clean Air v. U.S.
EPA, 959 F.2d 839, 845 (9th Cir. 1992) (reviewing PSD permit).
 SURCCo's petition focuses on purported technical errors
in the air quality analyses of sulfur dioxide and fine particulate
matter and on assertions that the EPA should have applied its
discretion differently.  SURCCo does not directly challenge the PSD
permit regulations or Guayama's attainment designation.  The EPA,
assisted by AES, defends the permit.
A. Sulfur Dioxide
 SURCCo first alleges that the EPA should have required
AES to conduct a full impact analysis of sulfur dioxide emissions.  
AES's modeled impact analysis for the 24-hour averaging time for
sulfur dioxide emissions (4.97 micrograms per cubic meter) was
minutely below the significant impact level (5.00 micrograms per
cubic meter).  SURCCo contends that the EPA should have ordered a
full impact analysis before granting the final permit because: a)
the EPA accepted "a combination of controls which have never been
used before," and b) to achieve the emissions limit, AES must
achieve a 99% efficiency rate.  That is, because the efficiency of
this combination of technologies is untested, the EPA should have
ordered a full impact study despite the fact that the modeled
impact was below the significant impact level that would
automatically trigger further testing.  Further, SURCCo says that
evidence it submitted -- which the EPA rejected -- contradicted
AES's impact analysis.  The EPA says, in response, that "the permit
requires AES to limit the facility's emission rate to extremely low
levels through an innovative combination of state-of-the-art
control technologies."  EPA also says that AES used appropriate
models while "the modeling on which SURCCo relies applied the
models simplistically and made unrealistic assumptions."  
 SURCCo has provided no evidence of arbitrariness or
capriciousness in the EPA's determination that AES's proposed
controls will achieve BACT, even though the combination of controls
is novel.  Each of these three components has been tested and used;
only their combination is new.  It was rational for the Agency to
prefer its own model, to reject SURCCo's proposed alternative
modeling that allegedly showed sulfur dioxide emissions above the
threshold levels, and to accept, instead, AES's modeling. As other
courts have held, the Agency's choice of a model will be sustained
if it bears a "rational relationship to the characteristics of the
data to which it is applied."  Appalachian Power Co. v. EPA, 135
F.3d 791, 802 (D.C. Cir. 1998) (computer models); see also Pan Am.
Grain, 95 F.3d at 105.  The Agency was, thus, within its
discretion, under the regulations, to exempt AES from conducting a
full impact analysis.
 SURCCo next alleges that the EPA erred in including in
its permit a condition that a full impact analysis be conducted
after the issuance of the permit.  This is, in a sense, an odd
argument for SURCCo to make, but it is made in furtherance of the
plea that a full impact analysis be required before, not after, the
permit issues.  A post-permit analysis will not do, SURCCo says,
because this denies SURCCo the right to comment on data collected
in that analysis.  Without accepting the premise that a community
group has no mechanism at all to comment, we note that there is no
legal requirement that there be public comment for a post-permit
analysis.  Indeed, the regulations allow the EPA to require post-
operation monitoring.  See 40 C.F.R.  52.21(m)(2).  Further, the
analysis must be conducted in accordance with EPA models and
protocols, see 40 C.F.R.  52.21(l)(1), which have been subject to
nationwide public review.
 SURRCo next contends that the EPA relied on outdated --
and perhaps incorrect -- air quality data to evaluate current air
quality conditions in Guayama.  It claims that AES should have
relied on more recent data collected by the Puerto Rico
Environmental Quality Board in 1990.  Further, before the EPA
issued this permit, it should have conducted ambient air quality
analysis (or, alternatively, should have relied on more recent
data) in order to determine if Guayama is, in fact, in attainment.  
Failure to have done so, SURCCO claims, was error.  The EPA replies
that it had no "reason to question the continuing validity of its
conclusion that total sulfur dioxide emissions from all sources in
the area were well below the [Standards], because no major new
sources had been constructed in the area since" 1983, when the EPA
last determined that the air quality in the area was below the
Standards.  The EPA also states that the Environmental Quality
Board's data would have been rejected if it had been presented.  
Finally, the EPA says that ambient air monitoring is required once
the facility is in operation.  In this case, there is no legal
requirement that ambient air monitoring should have been done prior
to the issuance of the permit, nor is there evidence that casts
doubt on the EPA's conclusion that current air quality is within
the Standards.
B. Fine Particulate Matter
 SURCCo contends that AES's fine particulate matter
analysis was flawed because AES used old and unrepresentative data
and failed to use more recent data that was available to it before
it issued the permit.  They contend that if the more recent data
were used the analysis would show that the fine particulate matter
standard would be exceeded.  The EPA, in response, contends that
AES complied with all of the modeling and monitoring requirements
and used the most recent data available to it prior to its permit
application.  The regulations do not require AES to consider post-
application data.  See 40 C.F.R.  52.21(m)(1)(iv) (background
monitoring data must "represent at least the year preceding receipt
of the [permit] application").  While some different fact patterns
(e.g., a great delay) might give SURCCo's argument more weight, the
facts here do not.  The EPA and AES present rational evidence that
the more recent data, on which SURCCo relies, are unrepresentative
and when corrected actually confirm AES's analysis that the
standards will not be exceeded.  The EPA also properly explained
why it modified the permit to include a revised BACT limit for fine
particulate matter.  Finally, the EPA also acted reasonably when it
asked AES (after the public comment period) to submit additional
information to take account of this revised limit.  See 40 C.F.R.
124.17(b).
                              III.
 SURCCo asks us, as well, to revoke the permit because of
alleged violations of the President's Executive Order on
Environmental Justice.  See Exec. Order No. 12,898, 59 Fed. Reg.
7629 (1994).  The Order requires that, "[t]o the greatest extent
practicable and permitted by law, . . . each Federal agency shall
make achieving environmental justice part of its mission by
identifying and addressing, as appropriate, disproportionately high
and adverse human health or environmental effects of its programs,
policies, and activities on minority populations and low-income
populations."  Id.  1-101, 59 Fed. Reg. at 7629.
 The Order, however, was "intended only to improve the
internal management of the executive branch"; by its own words, the
order "shall not be construed to create any right to judicial
review."  Id.  6-609, 59 Fed. Reg.  at 7632-33.  We therefore
cannot review the permit on this basis.  See Morongo Band of
Mission Indians v. FAA, 161 F.3d 569, 575 (9th Cir. 1998); see also
Air Trans. Ass'n of Am. v. FAA, 169 F.3d 1, 8-9 (D.C. Cir. 1999).
 We have considered SURCCo's other arguments, as well, and
conclude that they are without merit.
                              IV.
 While the residents of Guayama may, indeed, have valid
concerns about the air quality in their municipality, and in
particular in Jobos, SURCCo's petition presents no basis to
conclude that Region II's grant of a PSD permit to AES was
arbitrary or capricious.  As this court said in Pan American Grain
Manufacturing Co., "[i]n each instance the EPA presented reasoned
explanations . . . notwithstanding petitioner's objections.  
Moreover, petitioner's criticisms . . . involve areas in which
EPA's expertise is heavily implicated, and we may not substitute
our judgment for that of the Administrator."  Pan Am. Grain, 95
F.3d at 105 (internal quotation marks and citations omitted).  
SURCCo's concerns, insofar as they relate to Guayama's attainment
designation, Puerto Rico's State Implementation Plan, emissions
from other facilities in the area, or other matters, do not effect
the validity of the permit and should be presented in other fora.
SURCCo's involvement was nonetheless of value to its objectives.  
That the permit issued here is particularly stringent may be due in
large part to the participation of the area residents.
 Petition denied.

</body>

</html>