**CARIBBEAN PETROLEUM CORPORATION,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Respondent.

No. 93–1597.

United States Court of Appeals,
First Circuit.

Heard June 6, 1994.

Decided July 7, 1994.

Karin G. Diaz–Toro, with whom Goldman, Antonetti & Cordova, Hato Rey, PR, was on brief, for petitioner.

Alan D. Greenberg, Atty., with whom Lois J. Schiffer, Acting Asst. Atty. Gen., Randolph L. Hill, Atty., Washington, DC, and Meyer Scolnick, Asst. Regional Counsel, New York City, were on brief, for respondent.

Before SELYA and CYR, Circuit Judges, and PETTINE,* Senior District Judge.

* Of the District of Rhode Island, sitting by designation.

CYR, Circuit Judge.

Petitioner Caribbean Petroleum Corporation challenges the discharge permit it was issued by the United States Environmental Protection Agency (EPA) under the Clean Water Act. Relying on our recent opinion in *Puerto Rico Sun Oil Co. v. United States EPA*, 8 F.3d 73 (1st Cir.1993), Caribbean contends that EPA acted arbitrarily and capriciously by incorporating a water quality certification issued by the Environmental Quality Board of the Commonwealth of Puerto Rico (EQB) which was still undergoing review by the EQB. Finding no error, we deny the petition for review.

## I

## BACKGROUND

We had occasion, in *Puerto Rico Sun Oil,* to survey the regulatory framework controlling the present appeal:

> The Clean Water Act, 33 U.S.C. § 1251, *et seq.,* prohibits the discharge into protected waters of any pollutant by any person, *id.* § 1311(a), unless a discharge permit has been secured from EPA. *Id.* § 1342. The permitting regime is a hybrid one in which both EPA and the counterpart state agency play a role. The precise role depends on whether EPA has delegated permit issuing authority to the state; but no such delegation is present here. Puerto Rico is treated as a state for purposes of the Clean Water Act, *id.* § 1362(3), and its local agency is the Environmental Quality Board.

> To obtain a permit, the applicant must satisfy a variety of substantive requirements under the Clean Water Act but, in addition, no EPA permit can issue unless the state in which the discharge will occur gives its own approval (called "certification") or waives its right to do so. 33 U.S.C. § 1341(a)(1). Further, the state certification may impose discharge limitations or requirements more stringent than federal law requires, and those more stringent obligations are incorporated into the federal permit as a matter of course. *See generally United States v. Marathon De-*

*velopment Corp.,* 867 F.2d 96, 99 (1st Cir. 1989) (describing state role).

*Id.* 8 F.3d at 74–75.

Petitioner Caribbean discharges a large volume of process and storm water from its Bayamon, Puerto Rico, refining facility into Las Lajas Creek, a protected waterway designated by EQB as a drinking water source. Caribbean has been regulated under the Clean Water Act National Pollution Discharge Elimination System (NPDES) at its Bayamon operation since it was issued a five-year permit in 1983. The present controversy surfaced during the NPDES renewal process, which proceeded as follows:

10/27/88 Caribbean files NPDES renewal application with EPA.

11/10/88 EPA requests EQB certification.

02/01/89 EQB issues draft certification, instructing EPA that it "shall be incorporated into [Caribbean's] NPDES permit."

04/07/89 Caribbean submits comments to EQB on draft certification, contending that its pollutant concentration standards are unreasonable, impractical, and unfeasible.

05/10/89 *EQB issues* (substantially unmodified) *final certification.*

06/30/89 Caribbean requests EQB reconsideration of certification issued 5/10/89.

08/07/89 EPA issues draft NPDES to Caribbean incorporating the 5/10/89 final certification.

09/06/89 EPA receives comments on draft NPDES from Caribbean.

10/13/89 *EQB notifies EPA that it is reviewing the 5/10/89 certification* and requests that EPA delay issuance of final NPDES pending review.

09/28/90 EPA issues final NPDES, incorporating 5/10/89 certification.

At the time the final NPDES was issued on September 28, 1990, EPA considered the May 10, 1989 certification appropriate for incorporation into the final NPDES because EQB had never stayed its certification and it therefore remained in effect as a matter of law. Now, more than five years later, EQB has yet to act on Caribbean's request for

reconsideration of the "final" certification issued May 10, 1989.

## II

### *Discussion*

■ Caribbean attempts to rest its challenge to the final NPDES on the coattails of *Puerto Rico Sun Oil*, by posing the same generic question involved there: Is it arbitrary and capricious for EPA to incorporate a water quality certification into a final NPDES while the certification ostensibly is undergoing review by the local agency? In *Puerto Rico Sun Oil*, we held that there was no *procedural* bar to the incorporation of an EQB certification which had not been stayed until after the final NPDES issued. *Id.* at 77. In a similar vein, we perceive no serious procedural obstacle in the present case.[1] We went on to hold, nevertheless, that in the circumstances presented in *Puerto Rico Sun Oil*, EPA's decision "made no sense," and amounted to arbitrary and capricious agency action absent explanation. *Id.* By contrast, however, here the only colorable rationality claim raised by Caribbean rests on a far less substantial basis.

■ "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Agency actions are not to be set aside as arbitrary and capricious, *see* Administrative Procedure Act, 5 U.S.C. § 706(2)(A), unless they lack a rational basis. *See, e.g., Rhode Island Higher Educ. Assistance Auth. v. Department of Educ.*, 929 F.2d 844, 855 (1st Cir.1991). Like other executive agencies acting within their respective bailiwicks, EPA is due substantial deference in inter-

preting and implementing the Clean Water Act—"so long as [its] decisions do not collide directly with substantive statutory commands and so long as procedural corners are squarely turned." *Puerto Rico Sun Oil*, 8 F.3d at 77; *see generally Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We therefore inquire whether, in the vernacular of *Puerto Rico Sun Oil*, the challenged EPA action—its issuance of a final NPDES notwithstanding EQB's request that EPA forestall its processes in anticipation of further action on Caribbean's request for review of the EQB certification—makes sense.

■ First, surface appearances aside, several factors plainly reflect that this case is not of a feather with *Puerto Rico Sun Oil*. Not least important is the fact that EPA delayed its issuance of the Caribbean NPDES for *almost a year* at EQB's request; whereas in *Puerto Rico Sun Oil* EPA incorporated the EQB certification within *two weeks* after learning that the certification was being reconsidered by EQB. Thus, whereas the timing of the EPA action in *Puerto Rico Sun Oil* lent to the impression that an administrative trap had been hastily snapped shut, there is nothing in the present record to indicate that the eleven and one-half month period EPA afforded EQB to review its certification was either unreasonable or arbitrary.

Second, the significance of the timing of the EPA action in *Puerto Rico Sun Oil* was magnified by a substantive Clean Water Act monitoring issue not implicated in these proceedings. As a consequence of EPA's precipitous action, the permittee in *Puerto Rico Sun Oil* was left to cope with a monitoring methodology unequivocally disavowed by EQB.[2] We found that this whipsaw certifica-

---

1. Caribbean raises two lackluster procedural claims which warrant but brief consideration. First, a request from the local certifying agency that EPA delay issuance of its NPDES pending reconsideration of the local agency certification is not the equivalent of a formal stay suspending the legal effect of the certification, such as EPA issued in the *Puerto Rico Sun Oil* proceedings, *see Puerto Rico Sun Oil*, 8 F.3d at 80. Second, since the original certification was never stayed, EPA was not obliged to resort to the procedures

in 40 C.F.R. § 122.44(d)(3) to compel EQB either to issue a new certification within 60 days or waive certification. *See Puerto Rico Sun Oil*, 8 F.3d at 80.

2. The late 1980s witnessed an abortive effort by EQB to alter its water quality monitoring methodology. For many years EQB Water Quality Standards had used a "mixing zone" method, which calls for pollutant concentrations to be measured in the protected waters into which the

tion procedure "made no sense." *Puerto Rico Sun Oil*, 8 F.3d at 77.[3]

Third, at no time did EQB stay its Caribbean certification. In *Puerto Rico Sun Oil*, however, EQB issued a formal stay, albeit after EPA had issued its NPDES incorporating the certification. Although this court held that the *ex post* EQB stay was ineffective, as a matter of procedure under the Clean Water Act, *id.* at 80 ("We agree with EPA that the [post-NPDES issuance] decision of EQB to re-characterize its certification order as nonfinal cannot affect the procedural validity of EPA's decision to grant the permit."), the fact remains that EQB, by staying the certification in *Puerto Rico Sun Oil*, took far more timely and definitive action than was ever taken during the eleven and one-half months (not to mention the ensuing four years) that EPA awaited EQB's promised review of the Caribbean certification.

Finally, moving beyond the precedential shadow cast by *Puerto Rico Sun Oil*, Caribbean has not identified (nor can we) any other potential manifestation of arbitrary and capricious agency conduct on EPA's part. Rather, our review evinces reasonable agency adherence to appropriate procedures and reasonable accommodation of Caribbean's legitimate interests. We note as a significant further consideration that should EQB issue Caribbean a revised certification, EPA may amend its NPDES. *See* 40 C.F.R. § 124.55(b); *Puerto Rico Sun Oil*, 8 F.3d at 80.[4] The availability of contingency procedures for considering post-issuance modifications to EQB's certification further reduces the likelihood of "arbitrary" EPA action in these circumstances.

### III

### CONCLUSION

Our conclusion that the challenged EPA action was not "arbitrary and capricious" is firmly rooted in the record evidence that (1) EPA stayed its hand for more than eleven months to permit EQB to reconsider its Caribbean certification; (2) yet EQB neither issued a new certification, nor stayed its original certification; and (3) the EQB certification incorporated in the NPDES essentially comported with the effluent monitoring policy to which Caribbean had been subject ever since it was first permitted under the Clean Water Act. We decline to visit on EPA the responsibility for unexplained, if not inexpli-

---

permitted discharge occurs. In 1989, however, EQB issued a draft document that adopted an "end-of-pipe" (or effluent) approach, whereby pollutant concentrations are measured at the discharge source, prior to dilution in the receiving waters. Although this draft document was withdrawn in 1990, the permittee in *Puerto Rico Sun Oil* had been certified during the brief reign of the new "effluent monitoring" policy, and this (presumably more exacting) monitoring methodology had been written into the certification EQB provided EPA.

**3.** "EQB had used a mixing zone analysis in the past and was proposing to do so in the future.... Yet just as [Sun Oil] moved to correct the EQB certification, EPA moved even more swiftly to adopt a final permit based on the EQB certificate that omitted a mixing zone analysis." *Puerto Rico Sun Oil*, 8 F.3d at 76.

In sharp contrast, no such ambivalent EQB monitoring methodology was at work in this case. Effluent monitoring, *see supra* note 2, was the pre–1990 baseline for Caribbean, which, unlike the permittee in *Puerto Rico Sun Oil*, discharges into a designated drinking water source. This much is clear from the face of the 1983 permit: "Samples taken in compliance with the monitoring requirements set out above shall be

taken at the outfall ... prior to discharge to Las Lajas Creek." Additionally, Caribbean's April 7, 1989, comments on EQB's draft certification requested "interim *effluent* standards," a further indication that the substantive standards contained in the certification, not the monitoring methodology, were driving the conflict between Caribbean and EQB. In sum, there is no evidence that the EQB certification issued to Caribbean was the product of a bureaucratic snafu such as infected the permitting process in *Puerto Rico Sun Oil*, 8 F.3d at 76 (noting that EQB's certification "must have appeared a probable candidate for administrative or judicial revision" as it incorporated effluent standards that had already been abandoned).

**4.** We need not address the complex issue as to whether any such changes to Caribbean's NPDES would run afoul of the Clean Water Act "anti-backsliding" provisions. *See* 33 U.S.C. § 1342(*o*). We do note, however, that EPA represents that anti-backsliding is "unlikely to be an issue in this case" because the modification of a NPDES to reflect changes in the local agency certification likely would come within one of several exceptions to section 1342(*o*). *See* 33 U.S.C. § 1342(*o*)(2) (prescribing five exceptions to section 1342(*o*)).

cable, EQB delays in undertaking or completing its promised reconsideration, nor to compromise in the meantime the important public interests served by the Clean Water Act.

The petition for review is *denied.*