UNITED STATES of America,
Plaintiff,

v.

COMUNIDADES UNIDAS CONTRA
LA CONTAMINACION,
Intervenor,

v.

Puerto Rico Electric Power
Authority, Defendant.

No. Civ. 93–2527 (CCC).

United States District Court,
D. Puerto Rico.

June 19, 2000.

Jason Feingold, U.S. Dept of Justice, Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, for plaintiff.

Peter Flynn, U.S. Dept of Justice, Environmental & Natural Resources Div., Environmental Enforcement Section, Washington, DC, for plaintiff.

Renata Kendrick–Cooper, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, for plaintiff.

Suzanne Lacampagne, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, for plaintiff.

Edna C. Rosario–Munoz, U.S. Attorney's Office District of P.R. Civil Division, Hato Rey, PR, for plaintiff.

Jorge Segurola, Goldman Antonetti & Cordova, San Juan, PR, for defendant.

## OPINION AND ORDER

ARENAS, United States Magistrate Judge.

On October 27, 1993, the United States filed a complaint against PREPA pursuant to several environment statutes and regulations, including the air quality and emission limitation requirements of the Clean Air Act, 42 U.S.C. §§ 7401–7431; the effluent limitations and National Pollutant Discharge Elimination System requirements of sections 301 and 402 of the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. §§ 1311–1342; the oil pollution prevention requirements promulgated at 40 C.F.R. pt. 110 pursuant to section 311 of Clean Water Act, 33 U.S.C. § 1321; the inventory requirements for hazardous chemicals pursuant to section 312 of the Emergency Planning and Community–Right–to–Know Act (EPCRA), 42 U.S.C. § 11022; the hazardous substance release reporting requirements promulgated at 40 C.F.R. pt. 302 pursuant to section 103 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9603; the hazardous substance release reporting requirements of section 302 of EPCRA, 42 U.S.C. § 11004; and the underground storage tank requirements promulgated at 40 C.F.R. pt. 280 pursuant to section 9003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6991b.

On March 15, 1999, after years of negotiation, the court entered a Consent Decree resolving the United States' claims against PREPA, while allowing PREPA to avoid any admission of liability. The expressed purpose of the parties in entering into such an agreement was to promote PREPA's compliance with and to "further the goals and objectives of the Clean Air Act, Clean Water Act, RCRA, CERCLA, and EPCRA, and the regulations promulgated to implement each of those statutes." [1] This Decree established the payment of civil penalties and provided for the implementation of various environmental projects by PREPA, in addition to including comprehensive injunctive provisions under the various environmental statutes mentioned above.

In its preamble, the Decree specifically states that the parties agreed that it had been negotiated "in good faith," that its implementation would "avoid prolonged and complicated litigation," and that both parties deemed it "fair, reasonable, and in the public interest." [2] The document further states that the parties agreed that the resolution of the United States' claims against PREPA through the entry and the enforcement of the Consent Decree and all of its stipulations was "in the best interest

---

1. Consent Decree at 13, ¶ 36.

2. Consent Decree at 2.

of the Parties and the public." [3] Moreover, PREPA there agreed that it would bear responsibility for ensuring the performance of any requirements stipulated by the parties and included within the Consent Decree, in accordance with their final negotiations as memorialized therein, and that it "shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree." [4]

There exist, however, certain specified provisions through which EPA and PREPA may, at any time, pursuant to the prescribed scheme stipulated in Section XXIII ("Modification"), at page 155,[5] negotiate modifications to the agreed upon requirements of the Consent Decree, provided that such comply with the Decree's expressed objectives. Additionally, and in case of disagreement(s) "arising under or with respect to" the Consent Decree, the parties included therein Section XV ("Dispute Resolution"), at page 138,[6] specifying the procedure they must engage in to resolve disputes.

The dispute here in question centers on the proper manner to perform Visible Emission (VE) readings, also known as "opacity" readings, using the EPA's Reference Method 9, 40 C.F.R. pt. 60, app. A, Meth. 9, as required by the Consent Decree.

## 1. THE FACTS

During the week of January 25, 1999, EPA inspectors carried out multimedia inspections at the four power generating plants owned and operated by PREPA— Palo Seco, San Juan, Aguirre, and South Coast—, to ensure PREPA's compliance with the PRSIP (Puerto Rico State Implementation Program) and with the requirements of the proposed Consent Decree.[7] During these visits, EPA inspectors conducted their own visible emissions (VE) opacity readings and reviewed the VE report sheets completed by PREPA's Method 9 trained readers. On these occasions, EPA first learned, through discussions with plant personnel, about PREPA's erroneous procedure for VE readings, which its agents had been directed by PREPA to

---

**3.** Consent Decree at 3.

**4.** Consent Decree at 11, ¶ 30.

**5.** Section XXIII ("Modifications"), at 155–156, ¶ 131, reads in part:

[The] EPA and PREPA may, by written agreement, without approval of the Court, modify the proposal, workplans, or statements of work submitted pursuant to the Decree and its attachments.

**6.** Section XV ("Dispute Resolution"), at 138–141, ¶¶ 95–100, reads:

Unless otherwise expressly provided for in this Consent Decree, including any Attachments or Appendices to this Consent Decree, the dispute resolution procedure of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. However, the procedure set forth in this Section shall not apply to actions by the United States to enforce obligations of PREPA that have not been disputed in accordance with this Section.

Any dispute that arises under or with respect to this Consent Decree or any of its

Attachments or Appendices shall, in the first instance, be the subject of informal negotiations between the Parties to the dispute. The dispute shall be considered to have arisen when one Party receives from the other Party a written Notice of Dispute. The period for informal negotiations shall conclude upon receipt of written notice from either Party but shall not exceed thirty (30) days from the date of the Notice of Dispute unless such time period is extended by written agreement of the Parties to the dispute.

In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding paragraph, then the written position advanced by EPA shall be considered binding unless PREPA invokes the formal dispute resolution procedures of this Section by filing with the Court a petition describing the nature of the dispute, describing the efforts made by the Parties to resolve the dispute.

**7.** On January 25, 1999, the Consent Decree had already been filed although not yet entered by the Court. It was finally entered on March 19, 1999 (Docket No. 142).

perform at "about one stack diameter above the top of the stack."

PREPA alleges it based its "one stack diameter" standard on certain correspondence between the two agencies. In a letter from PREPA's Mr. Asbel Escribano, dated October 29, 1997, Mr. Escribano wrote: "The acid mist formation is not at the stack exit, it is detached. It is formed at a distance equivalent to 1 stack diameter away from the stack. There is no visible steam condensation at the stack exit." Based on this information provided to EPA by PREPA, Mr. Thomas Logan, a Senior Environmental Engineer in EPA's Office of Air Quality Planning and Standards, advised PREPA, in a letter dated November 3, 1997, as follows: "As you stated for your particular case, if you do not believe that there is any steam condensation present, I would read the opacity at the most dense portion of the plume at one stack diameter." In another letter dated July 12, 1999, as soon as the present controversy became apparent to Mr. Logan, he clearly expressed to PREPA that his former recommendation had been based on their allegations and that the turning point of compliance with Method 9 was observation of the plume "at the greatest point of opacity".

Thus, although PREPA argues that this "one stack diameter" measure was approved and advised by EPA, the linchpin of PREPA's supporting argument originated with PREPA itself, based on PREPA's misleading and over-generalizing description of its situation to EPA. The accurate manner of conducting Method 9 inspections requires, however, that "[o]pacity observations shall be made at the point of greatest opacity in that portion of the plume where condensed water vapor is not present." 40 C.F.R. pt. 60, app. A, Meth. 9, § 2.3. From the scant documentation PREPA had submitted to EPA, EPA was unable to find a connection between PREPA's "one stack diameter" standard and Method 9's "point of greatest opacity." A *fortiori*, PREPA's VE observations are not Method 9 readings.

On January 25, 1999, during their visit to the Palo Seco power plant, EPA inspectors in fact pointed this out to Mr. Elí Matos, PREPA's Environmental Affairs Legal Director, who agreed to look into these matters and to make the necessary changes. In its February, 1999 Inspection Report, EPA informed PREPA of PREPA's erroneous Method 9 readings and of the suspicion this casts over both PREPA's establishment of its Optimal Operating Ranges (OORs) and over PREPA's reports of compliance with both the PRSIP and the Consent Decree.

EPA attempted to resolve this issue with PREPA through numerous phone calls and meetings, prior to, and in an attempt to avoid resorting to, invoking the Consent Decree's Dispute Resolution's (Section XV) paragraph 96[8] by the issuance of a Notice of Dispute. During these discussions, PREPA stated that it had conducted an internal review of its Method 9 compliance program, for which it had contracted with an independent consulting firm. PREPA alleged that this review supported its position that their opacity observations were in compliance with Method 9. However, no studies, reports, or any other documentation was submitted to the EPA verifying such compliance.

Unable to resolve this issue through informal consultations, or to even engage in

---

8. Section XV ("Dispute Resolution"), at 139, ¶ 96, reads:

Any dispute that arises under or with respect to this Consent Decree or any of its Attachments or Appendices shall, in the first instance, be the subject of informal negotiations between the Parties to the dispute. The dispute shall be considered to have arisen when one Party receives from the other Party a written Notice of Dispute. The period for informal negotiations shall conclude upon receipt of written notice from either Party but shall not exceed thirty (30) days from the date of the Notice of Dispute unless such time period is extended by written agreement of the Parties to the dispute.

any substantive communications with PREPA, and in view of PREPA's continuous cancellation of scheduled meetings, on August 23, 1999,[9] and pursuant to the Consent Decree, paragraph 96, EPA sent PREPA a Notice of Dispute, which triggered a 30–day period for informal negotiations. EPA tried to accommodate PREPA's apparent scheduling difficulties by extending the informal negotiations period a number of times, but it subsequently became "obvious" to EPA that further delays by PREPA would be inevitable.

Throughout this process, on at least six different occasions,[10] EPA requested from PREPA the contracted studies and supporting documentation of PREPA's alleged compliance with Method 9 procedures. After PREPA repeatedly promised and failed to send EPA these documents, on October 29, 1999, during a phone conversation between attorneys for EPA and PREPA, PREPA's counsel responded that it would not provide such, due to concerns over confidentiality. Since PREPA had not yet engaged in, and was likely to keep avoiding, any substantive discussion of the issues, on November 5, 1999, pursuant to paragraph 97 of the Consent Decree,[11] EPA issued a Notice of Dispute concerning PREPA's misinterpretation of Method 9.

## II. THE LAW

■ Judicial review of EPA's actions pursuant to the stipulations of the Consent

Decree negotiated by the United States Environmental Protection Agency and the Puerto Rico Electric Power Authority and entered by this court in March, 1999, and the pertinent statutes and regulations which it was designed to promote, is governed by provisions set forth within the Consent Decree and by the provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *See Adams v. United States EPA,* 38 F.3d 43, 49 (1st Cir.1994). Under the APA, the applicable standard of review is whether the EPA's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Puerto Rico Aqueduct & Sewer Auth. v. United States EPA,* 35 F.3d 600, 604 (1st Cir. 1994); *Puerto Rico Sun Oil Co. v. United States EPA,* 8 F.3d 73, 77 (1st Cir.1993). A court should not set aside agency actions as arbitrary and capricious unless the actions lack a rational basis, as when an agency's actions lack a reasoned explanation, inexplicably depart from standard policies, are based on discriminatory practices, or are based on considerations Congress did not intend to make relevant. *See Caribbean Petroleum Corp. v. United States EPA,* 28 F.3d 232, 234 (1st Cir. 1994); *Wong Wing Hang v. INS,* 360 F.2d 715, 718 (2nd Cir.1966); *United States ex rel. Kaloudis v. Shaughnessy,* 180 F.2d 489, 491 (2nd Cir.1950).

■ The scope of review under the "arbitrary and capricious" standard is thus

**9.** Exhibit 5, August 23, 1999, Letter from EPA to PREPA.

**10.** Exhibit 6, November 5, 1999, Letter from EPA to PREPA.

**11.** Section XV ("Dispute Resolution"), at 139, ¶ 97, reads:

In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding paragraph, then the written position advanced by EPA shall be considered binding unless PREPA invokes the formal dispute resolution procedures of this Section by filing with the Court a petition describing the nature of the dispute, describing the efforts made by the Parties to resolve the dispute, and proposing a resolution of the dispute, including, but not

limited to, the relief requested and any schedule pursuant to which the dispute must be resolved to ensure orderly implementation of the Consent Decree. Any such petition shall be filed within fifteen (15) days from the date of conclusion of the informal negotiation period as set forth in the preceding paragraph. In any such dispute, PREPA shall bear the burden of proof. No inferences or presumptions adverse to either Party will be drawn as a result of the termination of informal negotiations or the invocation of formal dispute resolution procedures. The United States shall have forty-five (45) days to respond to the petition.

a narrow one, and the court should not substitute its judgment for that of the agency. *Caribbean Petroleum Corp. v. United States EPA*, 28 F.3d at 234. (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Courts should defer to an agency's interpretation of a statute that it is charged with enforcing. The court's deference increases when the agency is interpreting statutes and regulations which have been entrusted to its administration. *Adams v. United States EPA*, 38 F.3d at 49. *See generally Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Shell Oil Co. v. EPA*, 950 F.2d 741, 747 (D.C.Cir.1991) (per curiam). As long as an agency stays within congressional delegation, it is within its power to make policy choices when interpreting a statute, and such choices and interpretations are also entitled to deference. *Arent v. Shalala*, 70 F.3d 610, 615 (D.C.Cir.1995). Moreover, an agency is entitled to an extra measure of deference with regard to factual questions involving technical and scientific matters in its own area of expertise. *Pan Am. Grain Mfg. Co. v. United States EPA.*, 95 F.3d 101 (1st Cir.1996); *Adams v. United States EPA*, 38 F.3d at 49; *Puerto Rico Aqueduct & Sewer Auth. v. United States EPA*, 35 F.3d at 604.

 Finally, in reviewing an agency's action, courts will not consider issues which the petitioner failed to present during the administrative process in accordance with the relevant procedural requirements. *Adams v. United States EPA*, 38 F.3d at 50. Respect for an administrative agency's role requires that the court ensures that challenges to an agency's interpretation of its governing statutes are first raised in the administrative forum. *Linemaster Switch Corp. v. EPA*,

938 F.2d 1299, 1308–09 (D.C.Cir.1991); *see also Natural Resources Defense Council, Inc. v. United States EPA*, 25 F.3d 1063, 1074 (D.C.Cir.1994). *Cf. Kelly v. United States EPA*, 203 F.3d 519, 521 (7th Cir. 2000) (stating that the court would not set aside an agency's decision to penalize violations unless there is no substantial evidence in the record, taken as a whole, to support its findings, and that failure to develop arguments during administrative proceedings may result in waiver of such). In *Massachusetts Dep't of Public Welfare v. Secretary of Agriculture*, the court expounded on the imperative of this doctrine of procedural default in the administrative context. *Adams v. United States EPA*, 38 F.3d at 50 (quoting *Massachusetts Dep't of Public Welfare v. Secretary of Agriculture*, 984 F.2d 514, 524 (1st Cir.), *cert. denied*, 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993)). The Supreme Court stated that when an administrative agency is allowed an opportunity to address a party's objections, it can apply its expertise on the field in question, exercise its informed discretion, solidifying the agency's autonomy and creating a "finely tuned record" for the event of judicial review. Additionally, it espoused this doctrine on the basis of judicial economy, so that interested parties will not simply turn to the courts as a "tribunal of first resort." *Id.*

### III. THE ANALYSIS

 Pursuant to the Consent Decree, PREPA bears the burden of proof for all disputes arising from the Consent Decree.[12] EPA's basic scientific determinations regarding the dispute are as follows. PREPA's stacks emit generally white-colored plumes, which the EPA has found are neither detached steam plumes, nor condensed water plumes, but are rather composed of sulfuric acid at "significant concentrations."[13] The point at which maximum opacity typically occurs for this

---

**12.** Consent Decree at 140, ¶ 97: "In any [dispute arising under or with respect to the Consent Decree], PREPA shall bear the burden of proof."

**13.** Exhibit 6, November 5, 1999, Letter from EPA to PREPA.

type of plumes is a few stacks diameters downwind of the stack, since it takes a certain amount of time for the sulfuric acid mist to reach maximum condensation. This is then the proper point at which to take all Method 9 VE readings of PREPA's sulfuric acid mist plumes, including those taken to establish the Optimal Operating Ranges (OORs) pursuant to the Consent Decree. VE readings taken at any other location, but the most opaque point in the plume are inaccurate, and thus any OORs established relying on such readings do not comply with the stipulations agreed upon by the parties in the Consent Decree. I thus find that PREPA in its selection of the point at which to observe opacity of emissions from its Generating Units, has not acted in compliance with Method 9. I agree with EPA's recommendation that PREPA revise its interpretation of Method 9 VE readings to abide by the proper procedure and that, based upon this correction, it also revise its OORs to comply with the terms of the Consent Decree.

EPA's positions regarding this dispute also include the following. PREPA should not be permitted to turn the court into a forum for presenting materials that should have been provided to EPA during the informal, "dispute resolution," administrative proceedings.[14] PREPA did not avail itself of the procedures set up by the Consent Decree, but instead has obstructed EPA's efforts to informally resolve the dispute by withholding information. If true, PREPA's information concerning its purported compliance with the Consent Decree and with the goals and objectives of the Clean Air Act, Clean Water Act, RCRA, CERCLA, and EPCRA, and the regulations promulgated to implement each of those statutes would have greatly narrowed, or eliminated, the issues now before the court.

PREPA contests EPA's determination that it failed to properly conduct VE readings and thus to properly establish Optimal Operating Ranges and to comply with both the PRSIP and the Consent Decree. PREPA argues that its oil-fired generating units produce emissions which include sulfur compounds and condensed water vapor (steam). PREPA alleges that "at the point of greatest opacity" the visible plumes emitted by its oil-fired generating units contain both sulfuric acid mist and steam, and that this steam presence disallows the use of Method 9 for visually determining the opacity of emissions. EPA's experts who have frequently observed the visible emission plumes emanating from the PREPA stacks, however, have determined that PREPA's most common visible emission plumes are sulfuric acid mist plumes, not steam. Reports prepared by PREPA's own contractor, Radian Corporation, and previously submitted to EPA, further confirm EPA's findings. Moreover, EPA's experts have established that there is no need for observers to deviate from Method 9 requirements, because PREPA's oil-fired units in fact normally emit no condensed water vapors. PREPA further characterizes as unfounded and precipitous EPA's determination that PREPA is a "recurring, egregious, or persistent" violator of Rule 403 of the Regulations for the Control of Atmospheric Pollution of the Commonwealth of Puerto Rico ("Rule 403") with respect to Generating Units 5 and 6 of PREPA's South Coast Facility. Petition of Puerto Rico Electric Power Authority for Dispute Resolution, February 28, 2000, at 1, ¶ 2, Docket No. 167.

14. Consent Decree at 34, ¶ 21a, reads thus:
PREPA shall organize, compile, retain, and make available to EPA upon request, all documentation generated in connection with activities conducted pursuant to paragraph F of Section V of the Consent Decree ["Determination In The Case Of Noncompliance"]. Such documentation shall include, but shall not be limited to, record of all data, observations, and results of testing generated by any Oversight Contractor.

## IV. CONCLUSION

I find that the EPA's actions under the Consent Decree are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." EPA has been able to present rational, reasoned explanations, supported by scientific facts, for its claims against PREPA. It has not in so doing departed from standard or based its actions on discriminatory considerations or on reasons otherwise unintended by Congress. Thus, there is no reason for the court to vacate the agency's determinations. This is especially so since the statutes upon which the Consent Decree was based have been entrusted to EPA by Congress for their administration, and since the matters surrounding this controversy are highly technical and scientific and within EPA's particular area of expertise. EPA has thus acted within its scope of authority pursuant to congressional delegation and under the terms of the Consent requirements. The Clean Air Act, for instance, imposes upon EPA a nondiscretionary duty to issue a notice of violation once it finds noncompliance with the SIP requirements. 42 U.S.C. §§ 7410(a)(2)(B), (c), (c)(5)(B), 7413(a)(1). Furthermore, once a Notice of Violation has been issued, EPA's decision to proceed further is discretionary, and it is not subject to review. *New England Legal Found. v. Costle*, 475 F.Supp. 425, 433 (D.Conn.1979), *aff'd*, 666 F.2d 30 (2nd Cir.1981).

Therefore, PREPA's requests for dispute resolution, (Docket Nos. 162, 167), scheduling order and hearing (Docket No. 168) are DENIED. The motion requesting order to notify CUCOO of any motion or document filed is GRANTED. (Docket No. 163.)

SO ORDERED.